STATE

v.

**Louis John MANOCCHIO et al.**

No. 83–509–C.A.

Supreme Court of Rhode Island.

Aug. 6, 1985.

Arlene S. Violet, Atty. Gen., Constance L. Messore, Sp. Asst. Atty. Gen., for plaintiff.

Thomas A. DiLugio, Providence, Martin K. Leppo and Anthony M. Traini, Leppo & Traini, Boston, Mass., for Louis Manocchio.

James J. Lepore, Coia & Lepore, Providence, Martin K. Leppo and Anthony M. Traini, Leppo & Traini, Boston, Mass., for Nicholas Manocchio.

Charles J. Rogers, Jr., Providence, for Paul Eacuello.

## OPINION

KELLEHER, Justice.

This case is before us on appeal by the defendants, Louis John Manocchio (Louis), Nicholas Paul Manocchio (Nicholas), and Paul Vincent Eacuello (Paul), from their convictions in Superior Court, after a jury trial, on charges of voluntary manslaughter and conspiracy to commit assault and battery with a dangerous weapon. Louis, Nicholas, and Paul, along with Stephen Eacuello (Stephen) and James Massarone (James), had previously been indicted by the grand jury for the November 2, 1980 murder of Richard Fournier (Fournier) and conspiracy to commit the murder. Ultimately, the jury was unable to reach a verdict in regard to Stephen and James, and a Superior Court trial justice declared a mistrial regarding each of them. The facts disclosed by the evidence introduced at the trial were as follows.

On the evening of November 1, 1980, Fournier took his friend Maureen Enright (Enright) to Gantry's nightclub in North Providence to watch a band called Love Lace. Fournier was a former road manager for the band. They went directly to the band's dressing room where, after a short time, they were joined by four members of Love Lace who were taking a break. Soon two other persons arrived. One, who said his name was Nicky, went over to Fournier and inquired about booking the band. Fournier did not appear to know this Nicky, later identified as Nicholas Manocchio. After a few minutes of conversation, Fournier went outside the dressing room, where he began conversing with "two bigger guys." After the members of the band had left the dressing room, Enright asked Nicholas and his companion what they wanted. Nicholas responded by informing Enright that she was not involved and that he just wanted his money. Although Enright was unable to make any in-court identifications, she did identify photographs of Nicholas, Louis, and Paul as persons at Gantry's that evening.

Bruce Martin (Bruce) and Jayne Leo (Jayne) also stopped in at Gantry's the night of November 1, 1980. They arrived at approximately 11:30 p.m., parked their cars separately, and then went into Gantry's, where they sat at the bar. Jayne,

who was seated at the bar to the right of her friend, Bruce, noticed a group of people on the other side of him. One of the members of this group was described as a well-dressed and well-groomed male with olive skin, dark hair, a beard, and a mustache. Jayne noticed that he was kissing and hugging a woman who was standing next to him. Another male within this group was described by Jayne as resembling the man who was kissing the woman; he also had dark hair and olive skin and appeared well groomed. At one point during the evening, Jayne left her seat to use the phone. During her walk to the phone, she asked a "big, tall" man, standing below a landing "face-to-face" with her, to step aside. After using the phone, she returned to her seat, where she remained for about a half hour before leaving Gantry's with Bruce. At this point the tall man and the two men who resembled each other had already left the bar area.

As Jayne walked out the door and onto a platform outside the nightclub, she observed four men fighting in the parking lot. According to her testimony, they were "screaming, hollering, kicking and hitting." She further testified that one person in this group, "the person they were beating on," was yelling, "Help me, help me, someone, please, help me. Let me explain. I can explain the whole thing." Jayne continued to observe the altercation as it moved to the rear of a car, where the victim fell to the ground, eventually crawling underneath the car apparently to escape the constant kicking by his three assailants. Jayne observed the victim "holding onto the axle" of the car as his attackers continued "kicking their feet underneath at him" while he sustained his pleas for help.

At some point during this commotion, according to Jayne, the "big person" walked to the back side of Gantry's parking lot, where he got into a pale yellow Cadillac. He moved the car, exited, walked around the front of that car, and opened the passenger door. The assailants attempted to pull Fournier from underneath

the other car saying, "Get in this car. You'll make it a lot easier on yourself. Just get in this car." Jayne continued to observe the disturbance as she pulled her car out into the street, and then she drove up the street to where Bruce had parked.

In court Jayne identified the three men she saw beating the victim in the parking lot. She recognized Paul Eacuello as the "big, tall fellow" whom she had passed on her way to make a phone call. She also identified Nicholas as the man with the cast on his arm, and Louis—the one kissing the woman in the bar—as the individual who resembled his brother, Nicholas. Jayne, obviously the state's chief witness, concluded her testimony by agreeing that there was no question in her mind that Paul, Nicholas, and Louis, defendants herein, were the individuals she had observed in the parking lot that evening.

In support of their appeal, Nicholas, Louis, and Paul raise a variety of issues. Several pertain to all three defendants while others, because of separately retained appellate counsel, are confined to the Manocchio brothers or Paul. We will first analyze and discuss those issues common to all three defendants and then examine those questions raised in support of the Manocchios' appeals. Additional facts will be supplied as may be necessary to place these issues in an appropriate context. We would point out, however, before proceeding to our analysis of these issues, that we shall devote our attention only to those assignments of error that we believe merit discussion.

The state introduced into evidence the autopsy report of the victim, Fournier, for the purpose of establishing the cause of his death. Although the autopsy of the victim had actually been performed by a Dr. Joel Zirkin (Zirkin), the state called Dr. Arthur Charles Burns (Burns), Deputy Chief Medical Examiner for the State of Rhode Island, to identify and produce the report because Dr. Zirkin no longer worked for the state medical examiner and was, at the time of trial, residing in Israel. Doctor Burns, who

did not proffer an opinion about the cause of Fournier's death, had been designated by Dr. William Q. Sturner, Chief Medical Examiner of the State of Rhode Island, as the keeper of the records. The defendants unsuccessfully objected to the introduction of the autopsy report by a motion in limine and by a motion to strike. On appeal, they raise four arguments in respect to this issue.

It is first argued that it was prejudicial error for the trial justice to allow Dr. Burns to testify as keeper of the records because he had never been designated before as keeper of the records but was so designated by his superior this one and only time. We are not persuaded by this contention. In *State v. Guaraneri*, 59 R.I. 173, 194 A. 589 (1937), a case dealing with the admissibility of hospital records in a criminal case where the state failed to produce the intern who had played a major role in the production of these documents, we held that "[i]f the person who made the entries is dead, incompetent or beyond the process of the court at the time of trial, other witnesses may identify the record as to how and by whom it was kept." *Id.* at 177, 194 A. at 591. *Guaraneri* thus supports the proposition that anybody who can attest to the authenticity of a record is competent to lay the foundation for its receipt even if he did not prepare the record.

■ In the instant case a voir dire hearing was held to determine whether there was untrustworthiness or unreliability in the circumstances surrounding the preparation of the autopsy report. During this hearing Dr. Burns testified about the functions of the Office of the Medical Examiner under G.L.1956 (1979 Reenactment) chapter 4 of title 23. Specifically, the doctor testified that it is mandatory that certain deaths be investigated, that autopsies are utilized in the execution of statutory obligations, and that once an autopsy is performed, a description of findings is required to be dictated by the forensic pathologist who performed the autopsy, here Dr. Zirkin, generally within forty-eight hours after he or she has completed the autopsy. Dr. Burns further testified that he had been employed by the Office of the Medical Examiner for approximately five years and that he was aware of the overall operation and workings of the office. Thus, the trial justice did not err in allowing Dr. Burns to lay the foundation for the receipt of Fournier's autopsy report.

We are equally unpersuaded by defendants' contention that the record does not support the trial justice's finding that Dr. Zirkin's unavailability was not the result of any design or contrivance on the part of the state. Unlike the situation in *Guaraneri* where we found "that the evidence before us completely fails to show any excuse for the absence as a witness of the interne who made that record," Dr. Burns, during a voir dire hearing, stated that Dr. Zirkin was residing in Israel and was no longer connected with the Office of the Medical Examiner. The trial justice accepted this testimony, and we find no basis to upset her ruling on this issue.

■ The defendants also urge us to find that the autopsy report, which all parties concede is hearsay, does not qualify for admission into evidence under any exception to the hearsay rule. In determining that the report was admissible as a hearsay exception, the trial justice relied on the statutory obligations imposed upon the medical examiner, the rationale underlying Rule 803 of the Federal Rules of Evidence,[1] and *State v. Jamgochian*, 109 R.I. 46, 280 A.2d 320 (1971), where we pointed out that although our business-record legislation, G.L.1956 (1969 Reenactment) § 9–19–13, refers only to "civil proceedings," a record may be admitted into evidence under the

---

**1.** Rhode Island has not adopted the Federal Rules of Evidence. However, in *State v. Acquisto*, —— R.I. ——, 463 A.2d 122 (1983), we adopted the standards set forth in Federal Rule 803(6) for the introduction of business records as evidence in criminal cases. The trial in the instant case antedated *Acquisto.*

common-law exception to the hearsay rule as being an entry made in the regular course of business. Because we believe that the admission of the autopsy report is supported by the standards set forth in Federal Rule 803(6) for the introduction of business records as evidence in criminal cases and adopted by this court in *State v. Acquisto,* —— R.I. ——, 463 A.2d 122 (1983), we are of the opinion that the trial justice did not err in admitting the autopsy report as a full exhibit.

Rule 803(6) of the Federal Rules of Evidence provides as follows:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness: * * * Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

Applying the standards set forth in Federal Rule 803(6), the previously discussed foundation laid by Dr. Burns for introduction of the autopsy report was adequate. Also, the trial justice found, after a voir dire hearing, that the "underlying trustworthiness" surrounding the generation of this report justified its admission. We also find little difficulty in viewing the Office of the Medical Examiner as a type of business envisioned by Rule 803(6).

The breadth of Rule 803(6) overlaps the hearsay exception for public records and reports contained in Rule 803(8).[2] In a situation in which a conflict exists, a public record not meeting the requirements of the more specific exception, Rule 803(8), may not be admitted under Rule 803(6). Graham, *Handbook of Federal Evidence,* § 803.6 at 824 (1981); *see also* Louisell & Mueller, *Federal Evidence,* § 452 at 710–11 (1980). Assuming for the moment the correctness of this position, we are nevertheless convinced that the report was properly admitted under Rule 803(6) because of our belief that the report could also come in under Rule 803(8), specifically 803(8)(B), if in fact the federal rules were in force in Rhode Island.

The defendants advance two arguments for their position that the autopsy report was inadmissible under Rule 803(8)(B). They first stress that Dr. Zirkin's opinion about the cause of death was not a matter observed and reported pursuant to a duty imposed by law within the meaning of Rule 803(8)(B) because his opinion was based in part on the findings, opinions, and conclusions of persons outside the state medical examiner's office. We believe this facet of defendants' argument is foreclosed by *State v. Dame,* —— R.I. ——, ——, 488 A.2d 418, 426 (1985), wherein we observed that the medical examiner "should not be required to close his eyes to

---

**2.** Rule 803(8) of the Federal Rules of Evidence provides:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness: * * * Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."

sources of information relied upon by mankind generally in order to determine the questions that must be resolved in his official capacity." In *Dame* we specifically held that the trial justice committed no error in allowing the medical examiner to testify, in a first-degree-arson case, concerning his opinion of the cause of death based in part on toxicological tests performed by a third party.

Rule 803(8)(B) excludes, in criminal cases, as an exception to the hearsay rule, matters observed by police officers and other law-enforcement personnel. Here, defendants also claim that the opinion in the autopsy report about the cause of death was reported by a person who "arguably falls within the 'law enforcement personnel' clause" because reports from the medical examiner's office are routinely used in criminal cases. Although it is true that the Office of the Medical Examiner is often an important participant in the prosecutorial effort, we are disinclined to accept the view that the phrase "police officers and other law enforcement personnel" includes medical examiners employed by the Office of State Medical Examiner. *Cf. United States v. Hansen*, 583 F.2d 325, 333 (7th Cir.), *cert. denied*, 439 U.S. 912, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978) (the Court, in a case arising out of an alleged arson-for-profit scheme, refused to broaden the interpretation of this phrase to include city building inspectors who had prepared records of building-code violations). As we indicated in *State v. Dame*, — R.I. at —, 488 A.2d at 427, a medical examiner, although often called as a forensic expert, bears more similarity to a treating physician than he does to one who is merely rendering an opinion for use in the trial of a case.

The Sixth Amendment right of confrontation, applicable to the states through the Fourteenth Amendment, has repeatedly been referred to as an "essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas*, 380 U.S. 400, 405,

85 S.Ct. 1065, 1068, 13 L.Ed.2d 923, 927 (1965). This court has often held that the right to cross-examination is guaranteed by the confrontation clause of the Sixth Amendment. *State v. Dame*, — R.I. at —, 488 A.2d at 423; *State v. DeBarros*, — R.I. —, 441 A.2d 549 (1982). Rhode Island's constitution provides a similar specific guarantee of a right to confrontation. It is found in article I, section 10. The defendants argue that the admission of the autopsy report has deprived them of their right to confrontation under the Sixth Amendment. We disagree.

It is well settled, of course, that not every extrajudicial declaration admitted at trial violates the Sixth Amendment. *Parker v. Randolph*, 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713, 723 (1979). It is not argued by defendants, nor could it be, that the Sixth Amendment right to confrontation mandates that no hearsay evidence can ever be introduced in a criminal trial. In the *Pointer* case itself, the Supreme Court referred to its decisions that have approved the admission of hearsay:

"This Court has recognized the admissibility against an accused of dying declarations, *Mattox v. United States*, 146 U.S. 140, 151 [13 S.Ct. 50, 53, 36 L.Ed. 917], and of testimony of a deceased witness who has testified at a former trial, *Mattox v. United States*, 156 U.S. 237, 240–244 [15 S.Ct. 337, 338–40, 39 L.Ed. 409]. See also *Dowdell v. United States*, *supra*, 221 U.S. [325] at 330 [31 S.Ct. 590 at 592, 55 L.Ed. 753]; *Kirby v. United States*, *supra*, 174 U.S. [47], at 61 [19 S.Ct. 574 at 579, 43 L.Ed. 890]. * * * There are other analogous situations which might not fall within the scope of the constitutional rule requiring confrontation of witnesses." *Pointer v. Texas*, 380 U.S. at 407, 85 S.Ct. at 1069–70, 13 L.Ed.2d at 928.

In circumstances in which the declarant is not available for cross-examination and his out-of-court statement is offered as an exception to the hearsay rule, courts are to engage in a case-by-case analysis to deter-

**8**

mine whether the right of confrontation of the accused is violated. *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). The test under *Dutton v. Evans,* as elucidated in *Mancusi v. Stubbs,* 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293, 301 (1972), is as follows:

> "The focus of the Court's concern has been to insure that there 'are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant,' *Dutton v. Evans,* * * *."

■ As previously mentioned, a voir dire hearing was held to determine whether untrustworthiness or unreliability existed in the circumstances surrounding the preparation of Dr. Zirkin's autopsy report. The trial justice concluded, after this hearing, that the "underlying trustworthiness" surrounding the generation of the autopsy report justified its admission. We conclude that the right of confrontation of defendants was not violated. This conclusion is based on the trial justice's finding that the circumstances surrounding the preparation of the autopsy report were trustworthy. We conclude that admission of the autopsy report was not error.

The trial justice instructed the jury that manslaughter is the unlawful killing of a human being without malice aforethought and without premeditation and deliberation, and that in order for manslaughter to be voluntary, as opposed to involuntary, there must be an intent to kill or take the life of another human being. During deliberations, the jury requested reinstruction on several charges, including voluntary manslaughter, and the trial justice basically reiterated her prior instruction. All defendants now challenge the propriety of this instruction, in part because the trial justice failed to discuss the concept of heat of passion. They claim that failure to discuss this concept entitles them to a new trial or reversal of the convictions. We disagree.

■ A review of the record reveals that all relevant objections on this instruction by the various defense counsel failed to include an allegation that the trial justice erred in overlooking a discussion of the concept of heat of passion or the rule of provocation. Counsel for Paul Eacuello, in the midst of what can only be described as a blizzard of objections, did object to the court's instruction on manslaughter, without distinguishing between involuntary or voluntary manslaughter. Later, after the trial justice had reinstructed the jury on the various charges, including voluntary manslaughter, this same attorney reiterated his objection, noting that manslaughter "should not be before this jury." Counsel for Nicholas Manocchio also proffered an objection to the voluntary-manslaughter instruction, reasoning that the jury should not have received the charge because the evidence did not support a showing of willful intent. As we recently pointed out in *State v. Farlett,* — R.I. —, —, 490 A.2d 52, 56 (1985), Rule 30 of the Superior Court Rules of Criminal Procedure directs trial counsel not only to object to the charge as given but also to articulate the objection in such a manner that the court is apprised of the exact nature of the alleged error, be it of commission or omission. Since counsel for all defendants here failed to so articulate, we must bypass the merits of the issue relating to the trial justice's failure to discuss the concept of heat of passion.

■ The defendants, apparently anticipating our disposal of this issue based on noncompliance with Rule 30, argue that if we should construe the stated objections at trial as not including the specific basis for objection urged on appeal, then we should consider the error in so instructing the jury as of the type that substantially impairs the jury's truth-finding function and so raises serious questions about the accuracy of the guilty verdict. In support of this position, they cite *Infantolino v. State,* — R.I. —, —, 414 A.2d 793, 796 (1980), a case in which we dispensed with our usual

procedural requirements for raising a constitutional question on appeal because it involved a novel constitutional claim that could not be anticipated at trial. Those extraordinary circumstances are not present in the instant case. We now turn to those issues unique to the appeals of both Louis and Nicholas Manocchio.

The Manocchios, Nicholas and Louis, contend that the trial justice erred in allowing into evidence in-court photographic identifications by various witnesses present at Gantry's on the evening of November 1, 1980, and during the early-morning hours of November 2, 1980. They insist that the totality of the circumstances surrounding these photographic-identification procedures was so defective as to be impermissibly suggestive and in violation of their due-process rights.

■ Our rules governing the conduct of trials involving identifications are clear. When a defendant challenges the admissibility of an in-court identification, the court, on facts elicited outside the presence of the jury, must decide whether a pretrial identification by the same eyewitnesses violated the defendant's due-process rights. If a violation is found, the court should then decide whether the in-court identification is still admissible because it has an independent source. *State v. Benton,* —— R.I. ——, ——, 413 A.2d 104, 110 (1980). For such identification procedures to amount to a due-process denial depends upon whether the photographic array, in the circumstances surrounding it, was so unnecessarily suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

During the trial, voir dire hearings were held on various motions to suppress courtroom identifications and photo identifications by a variety of witnesses, including Jayne Leo; the bartender, Robert Marcoux (Marcoux); a band member, Robert Calello; and Maureen Enright, who accompanied Fournier to Gantry's on the night in question. Several sets of photographs containing five pictures each are central to this facet of the appeal. The state's exhibit Nos. 23 and 24 each include a snapshot of Paul Eacuello; exhibit No. 25 includes a snapshot of Nicholas Manocchio; and exhibit No. 26 includes a snapshot of Louis Manocchio.

Marcoux was the only bartender at Gantry's on the night of November 1-2, 1980. At about 10 or 10:30 p.m., according to his testimony, six men came in and approached the bar; he had an opportunity to see what they looked like as he waited on them; and later, during a suppression hearing, he was able to describe five of the men. On November 6, 1980, he went to the North Providence police station where a police officer presented him with a series of five photographs, later marked state's exhibit Nos. 23-A through -E. Aside from being told to examine the photographs to see if he could recognize any of the men portrayed in them, Marcoux testified that no one gave him any additional directions. He looked at the photographs and recognized 23-B, a photograph of Paul Eacuello, as showing the "tall, big guy" present at the bar that evening. He also identified Paul Eacuello in the courtroom as one of the men to whom he had served drinks that evening.

Marcoux also testified that on November 7, 1980, two North Providence police officers came to his home with another photographic array, later marked state's exhibit Nos. 25-A through -E. Marcoux selected 25-C, a photograph of Nicholas Manocchio, as a picture of one of the men who was in that group of six at Gantry's on the night in question. Marcoux could not identify Nicholas in the courtroom, nor could he recall whether the individual depicted in 25-C was the man with a cast on his arm that evening.

Robert Calello (Calello) was a drummer with the band Love Lace and was working at Gantry's on the evening of November 1, 1980, and during the early-morning hours of November 2, 1980. During a band break, he was in the dressing room with

Fournier when another member of the band brought in two individuals who had identified themselves as club owners interested in hiring the band. He conversed with them for about ten minutes before leaving the dressing room. He later saw the same two men at the end of the bar and attempted to make idle conversation with them, but they walked away from him.

On November 20, 1980, Love Lace was booked at another nightclub in Pawtucket. Before their performance, Lieutenant George V. Bergeron (Bergeron) of the North Providence police arrived to show the band members individually some photographic arrays. Calello testified that the lieutenant laid out one packet of photographs at a time, with four or five pictures in each group, without advising or directing the drummer about which person to select. He examined all the photographs in each array and was able to make two selections of pictures of individuals whom he recognized as having been in the dressing room at Gantry's. He selected a photograph of Nicholas Manocchio, exhibit No. 25–C, with no doubt in his mind, as a picture of the man with the cast on his arm that evening. He also selected from an array later marked state's exhibit Nos. 26–A through –E, exhibit No. 26–E, a photograph of the second person in the dressing room, Louis Manocchio.

Maureen Enright, the woman who accompanied Fournier to Gantry's, was shown six sets of photographs on November 13, 1980, approximately twelve days after the incident. From these arrays she selected 24–B (Paul Eacuello), 25–C (Nicholas Manocchio), and 26–E (Louis Manocchio), as photographs of persons who were present at Gantry's the night Fournier was beaten to death. At the voir dire she could not identify anyone from the array numbered 25–A through –E, but when she appeared before the jury a day later, she selected exhibit No. 25–C, a photo of Nicholas Manocchio. During subsequent cross-examination, she was asked how she could select a photograph on Friday that she was unable to select on Thursday, and she replied that she had not discussed the case with anyone or remembered any marking on that photograph, but that her memory had improved.

Jayne Leo, the sole eyewitness to the homicide, observed the Manocchios and Paul Eacuello at the bar in Gantry's on the night of November 1, 1980, and also observed them later as they brutally assaulted Fournier in the parking lot. On November 6 and 7, 1980, Bergeron showed Jayne several sets of photographs, and she identified photograph Nos. 24–B (Paul Eacuello), 25–C (Nicholas Manocchio), and 26–E (Louis Manocchio) as representing persons she observed at Gantry's the night of the homicide. A voir dire hearing was held on defendants' motion to suppress Jayne's photographic identifications. The court denied this motion, noting that there was nothing in any of the arrays that warranted a finding of suggestiveness. The trial justice denied similar motions directed at suppressing the photographic identifications of defendants by Robert Marcoux, Robert Calello, and Maureen Enright.

■■■■ In passing on a decision of a trial justice on a motion to suppress, the duty of the reviewing court is to view the evidence in the light most favorable to the government and apply the "clearly erroneous" rule. *State v. Beaumier,* —— R.I. ——, 480 A.2d 1367 (1984); *State v. Jenison,* —— R.I. ——, 442 A.2d 866 (1982). The photographs are part of the record, and we have independently examined them and the testimony concerning the conditions and the conduct of the police during the presentation of the arrays. Although the photographs were not uniform, they were substantially similar. We are unable to find that the various arrays, under the totality of the circumstances surrounding them, were so unnecessarily suggestive as to give rise to a very substantial likelihood of irreparable misidentification. We conclude that the trial justice did not err in denying the motions to suppress the photographic identifications.

Louis and Nicholas Manocchio also contend that Jayne Leo's in-court identifications of them were tainted by the cumulative impact of two constitutionally defective events: the suggestive photographic arrays and the so-called confrontation at the courthouse. Since we have already concluded that the photographic arrays were not suggestive, our analysis on this facet of the appeal will be confined to the courthouse confrontation. Some six months prior to the start of the actual trial, when the parties apparently thought the trial was about to begin before another Superior Court justice, Jayne Leo was escorted to a courtroom by the prosecutor and Lieutenant Gerard Hamel, a North Providence police officer. After the case was called and the attorneys went into the judge's chambers, Jayne went out into the hallway to have a cigarette. While in the hallway, she observed defendants. The Manocchios now claim that this encounter constituted such a suggestive circumstance that Jayne's subsequent in-court identifications were rendered inevitable by the incident. The defense, during yet another voir dire, called several witnesses to support their claim that at that time Lieutenant Hamel took the opportunity to point out defendants and identify them to Jayne. The court, rejecting this claim, found as a result of the testimony presented at this voir dire hearing that nothing more occurred than an "accidental encounter," not a one-on-one confrontation. After reviewing the evidence, we conclude that the trial justice's finding was not clearly erroneous when she discounted the testimony of the defense witnesses and believed the assertions of the state's witnesses.

At trial, the state introduced exhibit Nos. 25–A through –E and 26–A through –E into evidence after Lieutenant Bergeron had laid a foundation for their receipt. These were the photographic arrays from which the witnesses had identified Nicholas and Louis Manocchio. The Manocchios now contend that the court erred in allowing these photographs into evidence because Bergeron had failed to provide a sufficient foundation for their admission.

For the admission of photographic evidence, we have always required that an adequate foundation be laid. We have consistently held that a proper foundation requires testimony that the photograph is a fair and accurate representation of facts personally observed by the witness. *State v. Pulphus,* — R.I. —, 465 A.2d 153 (1983). Turning to the facts of the case at bar, we believe the trial justice did not abuse her discretion by determining that the state provided a sufficient foundation for the admission of the photographic arrays that included snapshots of Louis and Nicholas Manocchio. First, Bergeron established that prior to his involvement in the homicide he had seen both Louis and Nicholas in and about the town of North Providence. He had seen both of them in the company of defendant James Massarone, whom he knew to be a brother-in-law of a member of North Providence's rescue squad. Bergeron, who identified both Louis and Nicholas in court, explained that on November 7, 1980, he first associated their names with the individuals he had previously seen with Massarone after their photos were procured from the Registry of Motor Vehicles. Finally, he identified the photographs of both Nicholas and Louis as representing the individuals whom he had previously observed in the company of Massarone. The trial justice did not abuse her discretion in finding that a proper foundation had been laid.

In their appeals, the Manocchios also claim that their respective indictments should be dismissed because of irregularities in the grand-jury proceedings. The irregularities include allegations that the grand-jury proceedings were conducted in a carnival-like-atmosphere; that a feeling of extreme bias and prejudice was created by the prosecutor who handled the grand jury;[3] and that unauthorized persons were

---

3. In *United States v. Cederquist,* 641 F.2d 1347, 1353 (9th Cir.1981), the trial judge found preju-

present in the grand-jury room. Motions to dismiss the indictments based on these allegations were denied by the trial justice. The trial justice, after listening to several hours of recorded grand-jury proceedings, concluded that the carnival-like-atmosphere charge lacked foundation. Although she acknowledged that some humorous comments had been made during the proceedings, she concluded that these episodes constituted but a "few minutes out of many hours of proceedings." The court rejected the contention that the prosecutor created an atmosphere of extreme bias and prejudice; and in response to the argument, based on sounds of footsteps and doors closing, that unauthorized persons were present in the grand-jury room, she apparently chose to accept the explanation by the prosecutor who handled the proceedings that such disturbances reflected grand jurors' using bathrooms or someone's walking to an outer door to call witnesses.

In considering the Manocchios' claim of prosecutorial misconduct, we would first note that the remedy they seek, dismissal of an indictment, is an extraordinary one. To dismiss an indictment because of such misconduct means that even though a petit jury has unanimously found a defendant guilty beyond a reasonable doubt, we would nevertheless void his or her conviction because the prosecution has made a misstep in obtaining a grand-jury determination of probable cause. Hence, the sanction sought is reserved for very limited and extreme circumstances. *State v. Romano,* — R.I. —, 456 A.2d 746 (1983). Quite frankly, these limited and extreme circumstances are not present here.

The final issue remaining for our consideration revolves around the timing of the trial justice's rulings on defendants' motions for judgment of acquittal. The trial justice had reserved decision on all motions

for judgment of acquittal proffered by counsel for all five defendants at the close of the state's case. Later, after all defendants, including Louis and Nicholas Manocchio, had rested their cases but before final arguments, the trial justice ruled on these motions. Both Manocchios now contend that the timing of the trial justice's rulings with respect to the motions of James Massarone and Stephen Eacuello constitutes prejudicial error. Specifically, the trial justice allowed judgments of acquittal to enter in regard to both Massarone and Stephen Eacuello on all charges except the lesser-included offense of conspiracy to commit assault and battery and in regard to Massarone only, aiding and abetting assault and battery. The Manocchios now maintain that had these rulings been made at the close of the state's case, both Massarone and Stephen Eacuello would have become available to testify and perhaps offer exculpatory evidence on their behalf.

We find these suppositions and ultimately this issue to be without merit. We are convinced, relying on our examination of the record, that even if the trial justice had ruled on these motions at the time the Manocchios now urge as proper, both Massarone and Stephen Eacuello would not have testified on behalf of Louis or Nicholas. (Paul Eacuello did not press this issue in his appeal.) As mentioned previously, both Massarone and Stephen Eacuello were not granted judgments of acquittal on all charges. Obviously, the Manocchios' position on this issue would have been strengthened if in fact these defendants were to have been granted judgments of acquittal on all charges.

More importantly, however, it also seems to us that the Manocchios waived any objection to the procedure followed by the trial justice since nowhere in the record does it appear that either Manocchio offered a timely objection to the trial justice's

dice because the prosecutor had conveyed to the grand jury his belief regarding the accused's guilt. On appeal, the Ninth Circuit Court of Appeals reversed, pointing out that, as a practical matter, grand jurors are well aware that they are listening to evidence about a case simply because the prosecutor believes that an indictment is merited.

decision to reserve ruling on such motions. Thus, the issue was not presented to the trial justice below and is not properly before us now. *State v. Cooke*, —— R.I. ——, ——, 479 A.2d 727, 733 (1984).

The appeals of Louis, Nicholas, and Paul are denied and dismissed. The judgments appealed from are affirmed, and the papers of the case are remanded to the Superior Court.

The Chief Justice participated in the oral argument and in the decision of the court, but he did not participate in the publication of the formal opinion.