STATE

v.

Aires CORREIA.

No. 91–6–C.A.

Supreme Court of Rhode Island.

Dec. 5, 1991.

James E. O'Neil, Atty. Gen., Jeffrey Greer, Jane McSoley, Asst. Attys. Gen., for plaintiff.

John F. Cicilline, Providence, for defendant.

## OPINION

FAY, Chief Justice.

This matter is before the Supreme Court on appeal by the defendant, Aires Correia (Correia), from a Superior Court conviction of second-degree murder. The defendant appeals his conviction on numerous grounds. He claims that the trial justice committed error (1) by denying the defendant's motion to suppress an inculpatory statement, (2) by admitting repetitious photographs of the decedent's body, (3) by admitting the autopsy report, (4) by excluding the testimony of Dr. Elia Shammas, and (5) in instructing the jury. For the reasons set forth herein, we affirm the judgment of conviction entered in the Superior Court.

On August 6, 1988, defendant, his wife, Maria, and their fourteen-month-old daughter went to Rocky Point Park (the park) accompanied by several family members and friends. After entering the park, defendant became separated from his wife. While at the park defendant consumed beer that he had brought to the park and hard liquor purchased at a lounge in the park.

Sometime in the afternoon defendant located his wife in the dinner hall. She was talking to a relative named Carlos. Although Correia was unable to hear the conversation between Carlos and Maria, defendant objected to his wife's talking to Carlos and told her, "When we get home, we're going to talk." Correia had previously spoken with Maria concerning her conversations with Carlos. The defendant did not want his wife talking to Carlos because defendant believed that Carlos spoke to Maria "like [he was] coming onto her."

Correia and his wife left the park separately. Upon leaving the park, Correia continued to drink at a lounge and then later at a social club.

Correia found his wife in bed when he returned to his home at 291 Weeden Street. The defendant began talking to his wife regarding his objection to her speaking with Carlos. Correia became angry when his wife ignored him. The defendant pulled the blankets off Maria and they began to fight. Correia began hitting his wife in order to "make her listen * * * [and] to show her that I didn't want her to be there" talking with Carlos. The defendant admitted biting his wife during the course of the fight. Although defendant later denied it, in making his confession to the police, he stated that he had kicked his wife during the struggle.

Maria ran from defendant and, in the course of trying to get away, had her nightclothes torn off her body. The defendant found his wife in the hallway and brought her back into the apartment. Upon reentering the apartment, Correia and his wife continued arguing. The defendant acknowledged at trial, however, that his wife "didn't say nothing in words" during the course of this argument. Correia stated that he continued hitting his wife in order to teach her a lesson. However, defendant denied ever having had the intent to kill his wife.

Maria again tried to run from defendant. When she turned to see if defendant was chasing her, she fell down the stairs. Correia followed her down the stairs, but when he reached the bottom, Maria bit his foot. This enraged defendant, and he again began striking his wife. The defendant then carried his wife up the stairs to their apartment and put her into their bed. The next morning, however, defendant was unable to awaken his wife.

Lieutenant Stephen Smith (Smith), Kenneth Moreau (Moreau), and Stephen Tanguay (Tanguay), firefighters with the Pawtucket fire department, were dispatched to 291 Weeden Street. The firefighters were directed to the bedroom where they found on the bed defendant's wife partially covered by a sheet. The woman appeared to be badly beaten and had dried blood around her nose and mouth.

Smith asked defendant what had happened. Smith testified that defendant responded that "they had had a terrible fight" and that he had beaten his wife. Officer Smith stated that Correia showed Smith and Moreau an imprint in the wall in the hallway. Smith testified that defendant said that "[h]e had kicked her [Maria] and her head had hit the wall."

Smith overheard defendant, his sister, and defendant's brother-in-law arguing about the fight defendant had had with his wife. Tanguay testified that he overheard defendant state, "You think I don't know what I did? I'm sorry. I have the rest of my life to pay for this." Moreau testified that he overheard defendant say that he had kicked his wife down the stairs.

Officer David Savard of the Pawtucket police department subsequently arrived at the apartment. Officer Savard testified that defendant "spontaneously" exclaimed that he had fought with his wife and that he had beaten her earlier in the morning. Officer Savard then informed defendant of his *Miranda* rights and asked him to say nothing further.

Detective Joseph O'Donnell, a police officer with the city of Pawtucket, arrived and ordered that defendant be transported to the police station. Detective O'Donnell determined that defendant was able to understand English. He then read defendant his *Miranda* rights and asked defendant to read and initial a rights-waiver form. The detective asked defendant if he would like to call an attorney. The officer testified that defendant stated that he did not need an attorney because he was going to plead guilty. Officer O'Donnell testified that defendant "just proceeded to open up freely" and describe the fight and the beating of his wife. The police officers had set up a video camera to record defendant's statement; however, the police officers later learned that the camera had not been turned on.

After Correia gave his oral statement, the police returned him to his cell while

Detective O'Donnell typed defendant's statement. Upon learning that the video camera had not been turned on, the detectives brought defendant back to an office. Detective O'Donnell testified that he then asked defendant to read and sign the typed version of defendant's statement, which defendant did. The time noted on both the rights-waiver form and defendant's typed statement is 10:55 a.m.

The police turned the video camera on. Detective O'Donnell then read defendant's statement to him. Correia made corrections or added details to the statement that the officer was reading. The defendant read the statement aloud. Both at the beginning and at the end of the videotape, the police asked defendant whether he had been advised of his constitutional rights and whether he wanted to waive these rights. The defendant responded affirmatively to both of these questions. The videotape ends somewhat abruptly. Detective O'Donnell testified that the detective operating the video camera believed that defendant might become emotional and agitated and that the detective would be needed to handle defendant.

At trial the state called Dr. Richard Callery, a medical examiner/pathologist for the State of Rhode Island, to testify. Doctor Callery, along with Drs. Edward Murray and Daniel Villarosa were present at the murder scene. Doctor Callery performed the autopsy on the victim. Doctor Villarosa was a physician in training who was studying to be a medical examiner. Doctor Murray functioned as a medical investigator. The trial justice qualified Dr. Callery as an expert in forensic pathology and admitted the autopsy report into evidence over objection by defense counsel. The autopsy report contained several references to the presence of bite marks on the victim's body. The trial justice concluded that Dr. Callery "may be permitted to offer his opinion with respect to" bite marks. At trial Dr. Callery testified concerning the bite marks that he had observed on the victim's body.

At trial, in the absence of the jury, the defense presented Dr. Elia Shammas, a board-certified psychiatrist on the staff at Rhode Island Hospital and Fuller Memorial Hospital and a professor at Brown University Medical School. Doctor Shammas testified that he met with Correia several times during January and February 1990. The doctor concluded that Correia suffered from a major affective disorder that was characterized by depression, sleep and appetite disturbance, loss of energy, and withdrawn behavior. According to Dr. Shammas, defendant's early childhood, his changing cultures, and his relationship with women contributed to his condition. The doctor also testified that defendant showed signs of chronic alcoholism and pathological jealousy. Doctor Shammas testified that this condition impaired defendant's judgment. The doctor stated that defendant's condition could render a person unable to act rationally in a situation involving a relationship.

Doctor Shammas also testified that "there is a difference between [Correia's] reaction and the norms of this country. * * * In this country, violence is not accepted. Violence is abnormal. People are expected to solve problems in a rational way, and rational does not include violence."

The trial justice concluded that Dr. Shammas's testimony was not admissible because it would tend to confuse and distract the jury. The trial justice also determined that the testimony "does not have any tendency in fact based upon the testimony I heard and the lack of an adequate offer of an opinion to affect the issue which [defense counsel] seeks to raise here, and that is the issue of diminished capacity."

## I

The defendant contends that the trial justice should have suppressed an inculpatory statement Correia made to Detectives O'Donnell and Lemire at the Pawtucket police station after his arrest. Correia argues that the state did not prove that he freely and voluntarily waived his constitutional rights before making his statement.

It is well settled that the trial justice must conduct a preliminary hearing outside the presence of the jury when a defendant challenges the voluntariness of a confession. *See, e.g., State v. Lima,* 546 A.2d 770, 772–73 (R.I.1988); *State v. Ferola,* 518 A.2d 1339, 1345 (R.I.1986); *State v. Verlaque,* 465 A.2d 207, 209 (R.I.1983). The confession is admissible if the trial justice's "examination of the totality of the circumstances surrounding the interrogation shows, by clear and convincing evidence, that the defendant voluntarily waived his right to remain silent and have the assistance of counsel." *State v. Verlaque,* 465 A.2d at 209–10. On appeal this court reviews the record to determine if the trial justice followed these procedural requirements. *Id.* at 210. The trial justice's decision will not be overturned unless it was clearly erroneous. *See, e.g., State v. Kennedy,* 569 A.2d 4, 8 (R.I.1990); *State v. Verlaque,* 465 A.2d at 210; *State v. Killay,* 430 A.2d 418, 421 (R.I.1981). In the present case we conclude that the trial justice properly made a determination of the admissibility of the statement outside the presence of the jury. Therefore, we review the record only to determine if the trial justice's decision was clearly erroneous.

In ruling on defendant's motion to suppress, the trial justice held that the state had met its burden of proving, by clear and convincing evidence (1) that the police had fully advised Correia of his constitutional rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), (2) that he had fully understood these rights and voluntarily waived them, and (3) that he thereafter confessed freely and voluntarily and without any coercion. An examination of the evidence adduced at the suppression hearing reveals that the trial justice was correct in concluding that defendant's confession was voluntary.

The testimony at the suppression hearing and at trial indicate that Detective Savard advised defendant of his *Miranda* rights while at 291 Weeden Street. The police again advised defendant of his *Miranda* rights prior to defendant's confession. The defendant appeared at all times willing to confess to beating his wife. The record indicates that defendant was able to understand his rights, the nature of his actions, and the consequences of a waiver of his rights.

The court listened to the videotape recording of Correia's confession. The tape itself is indicative of its voluntariness. The defendant appeared relaxed and calm. He listened intently and made corrections or added details to the typed version of his oral confession. Twice on the videotape defendant agrees that the police advised him of his constitutional rights prior to making his statement and that he wished to waive these rights.

The defendant refers to the fact that the same time appears on the rights-waiver form and the typed confession as evidence for his argument that his statement and the video recording preceded the administration of the *Miranda* warnings. Although Detective O'Donnell was unable to explain why the times were the same, he emphatically denied that the two documents were signed at the same time. The videotape contradicts defendant's argument. The videotape shows defendant agreeing that he confessed only after waiving his rights. We are therefore of the opinion that the trial justice properly admitted defendant's inculpatory statement.

## II

The defendant suggests that the trial justice abused her discretion in admitting into evidence nineteen photographs taken at the crime scene. Although defendant acknowledges that the photographs are fair and accurate representations, he contends that they were repetitious and caused substantial prejudice to him before the jury, which prejudice outweighed the photographs' probative value.

It is within the trial justice's discretion to determine the materiality or relevancy of photographs. *See, e.g., State v. Griffin,* 567 A.2d 796, 800–01 (R.I.1989); *State v. Ware,* 524 A.2d 1110, 1113

(R.I.1987); *State v. Diaz*, 521 A.2d 129, 134 (R.I.1987). This court has defined relevant evidence as any evidence having a tendency to prove or disprove some material fact in issue. *State v. Barnville*, 445 A.2d 298, 301 (R.I.1982). In criminal cases photographs are admissible for numerous reasons, such as displaying the extent of the injury or identifying the body and its condition. *State v. Ryan*, 113 R.I. 343, 350, 321 A.2d 92, 96 (1974). We review the record to ascertain if the trial justice carefully considered whether the prejudicial effect of the photographs outweighed their probative value. *State v. Griffin*, 567 A.2d at 801. However, even if the evidence is "of a gruesome nature and might tend to unduly influence the jury * * * it nevertheless was not inadmissible merely on that ground, if it was otherwise material and competent." *State v. Smith*, 70 R.I. 500, 513, 41 A.2d 153, 159 (1945). We conclude that the trial justice properly admitted the photographs.

█ The trial justice admitted nineteen photographs taken at the crime scene, eight of which depicted the victim's body. Although the photographs contained graphic portrayals of the victim's severely beaten and bloody body, the pictures of Maria show different sides and portions of her body and were taken at different angles. Officially the victim's death was attributed to multiple blunt-force injuries including craniocerebral trauma. Therefore, the photographs were relevant to show the brutality of the beating the victim suffered at the hands of defendant, which brutality resulted in the victim's death. Although the photographs may be considered gruesome in nature, they are admissible because they are probative on the cause of death and the severity of the beating. We are therefore of the opinion that the trial justice did not abuse her discretion in admitting the challenged photographs.

## III

█ The defendant contends that the trial justice erroneously admitted into evidence the autopsy report prepared by Dr. Callery that contained references to bite marks and other information supplied by Doctors Villarosa and Murray. The defendant claims that the trial justice should have excluded the report because some conclusions contained in the report originated from Drs. Villarosa and Murray, who did not testify at trial, thereby violating defendant's constitutional right of confrontation. Rule 803(8) of the Rhode Island Rules of Evidence provides as follows:

> "*Public Records and Reports.* Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel [personnel], or (C) in civil actions and proceedings and against the state in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."

The State Office of the Medical Examiner is a statutorily created agency of the government coming within Rule 803(8). Doctor Callery prepared the report while employed by the medical examiner's office. Doctor Callery, as a medical examiner, was under a legal duty to perform an autopsy, listing his findings and conclusions regarding the factual cause and manner of death. The doctor also testified that the autopsy report contained the activities of the medical examiner's office. Therefore, we conclude that the admission of the autopsy report is supported by the standards set forth by Rule 803(8).

█ The Sixth Amendment to the United States Constitution, which was made applicable to the states through the Fourteenth Amendment, provides the accused the right "to be confronted with the witnesses against him [or her]." "This court has often held that the right to cross-examination is guaranteed by the confrontation clause of the Sixth Amendment."

*State v. Dame*, 488 A.2d 418, 423 (R.I.1985); *State v. DeBarros*, 441 A.2d 549, 552 (R.I.1982). Article I, section 10, of the Rhode Island Constitution also guarantees a defendant the right of confrontation. However, the right of confrontation does not bar the admission of all hearsay evidence. *State v. Manocchio*, 497 A.2d 1, 7 (R.I.1985); *see Dutton v. Evans*, 400 U.S. 74, 80, 91 S.Ct. 210, 215, 27 L.Ed.2d 213, 222 (1970). When an out-of-court statement is offered and the declarant is not available, courts must engage in a case-by-case analysis to determine whether the right of confrontation of the accused is violated. *State v. Manocchio*, 497 A.2d at 7–8. The reliability of the hearsay is determinative of the statement's admissibility. *Dutton v. Evans*, 400 U.S. at 89, 91 S.Ct. at 220, 27 L.Ed.2d at 227.

In this case Dr. Callery performed the autopsy report and testified at trial that he observed bite marks on the victim. The trial justice concluded that Dr. Callery was qualified to testify concerning the bite marks. The doctor also testified that because he was at the crime scene, he did not rely on information provided by Drs. Villarosa and Murray in preparing the autopsy. Thus defendant had ample opportunity to confront Dr. Callery at trial and to question him on the reliability of his observations, and therefore, defendant's right to confrontation was not violated.

The extent to which the report might have contained information from other sources does not, however, make the report inadmissible. *State v. Manocchio*, 497 A.2d at 6; *State v. Dame*, 488 A.2d at 426. A medical examiner need not close "his [or her] eyes to sources of information relied upon by mankind generally in order to determine the questions that must be resolved in his [or her] official capacity." *State v. Dame*, 488 A.2d at 426. We therefore conclude that the trial justice's admission of the autopsy report was not an error and that defendant's right of confrontation was not violated.

## IV

The defendant argues that the trial justice erroneously excluded the testimony of Dr. Shammas. The defendant contends that by excluding this testimony, the trial justice prevented defendant from fully presenting the defense of diminished capacity.

It is within the trial justice's discretion to determine whether the testimony of an expert witness is admissible. *State v. Castore*, 435 A.2d 321, 325–26 (R.I.1981). In determining the admissibility of expert testimony, the trial justice must determine that the testimony is relevant and that it will be helpful to the jury. *State v. Wheeler*, 496 A.2d 1382, 1388 (R.I.1985); *Morgan v. Washington Trust Co.*, 105 R.I. 13, 17–18, 249 A.2d 48, 51 (1969). The trial justice's decision on admissibility will not be reversed unless the "trial justice abused his [or her] discretion, thereby causing substantial injury to the party seeking the admission of such evidence." *Gaglione v. Cardi*, 120 R.I. 534, 538, 388 A.2d 361, 363 (1978).

After careful examination of the transcript, we conclude that Dr. Shammas was not able to testify with any degree of medical certainty concerning defendant's mental condition on the date of the murder. The doctor's conclusion that defendant suffered from a major affective disorder is based on tests and evaluations conducted on defendant approximately eighteen months after his wife's murder. Doctor Shammas testified that his diagnosis concerning defendant's condition was based on history provided to him by Correia. Although the doctor testified that defendant exhibited signs of depression in 1990, the doctor could testify only that defendant "probably * * * had signs of depression" at the time of the murder. Doctor Shammas also indicated that Maria's death was a contributing factor in defendant's sleep disturbance.

On appeal defense counsel argues that the trial justice should have permitted Dr. Shammas to testify concerning defendant's cultural differences. The defendant asserts that his cultural differences caused him to accept violence as the norm. The

defense counsel, in his offer of proof at trial, did not clearly indicate that the doctor would testify that defendant's cultural differences affected his ability to make judgments. The defense indicated that Dr. Shammas would "testify to two significant things," pathological jealousy and chronic alcoholism. The defendant provided testimony on both these issues; for that reason, he was not precluded from presenting his defense of diminished capacity. We are therefore of the opinion that Dr. Shammas's testimony concerning defendant's mental condition was not relevant on the issue of defendant's diminished capacity and would not have aided the jury in determining defendant's capacity on the date of the murder. Consequently we conclude that the trial justice was not clearly wrong in excluding Dr. Shammas's testimony on this issue.

## V

The defendant challenges the trial justice's charge to the jury on three grounds. First, defendant argues that the trial justice neglected to instruct the jury that the state had the burden of proving every element of the crime, including the absence of diminished capacity by intoxication beyond a reasonable doubt. Second, defendant asserts that the trial justice's instruction on diminished capacity should not have been limited to intoxication but should have included extreme emotional disturbance, pathological jealousy, chronic alcoholism, and cultural differences. Third, defendant contends that the trial justice's instruction permitting the jury to consider the lesser included offense of manslaughter eliminated defendant's presumption of innocence.

When a defendant challenges a specific portion of a trial justice's charge, this court views the jury charge as a whole to determine "whether the trial justice delineated the legal principles to comport sufficiently with due process requirements." *State v. Bibee*, 559 A.2d 618, 619 (R.I.1989); *see State v. Caruolo*, 524 A.2d 575, 582 (R.I.1987). However, this court will not examine each portion of the instruction in isolation to determine its accuracy. *State*

*v. Lamoureux*, 573 A.2d 1176, 1179 (R.I.1990). Our reading of the charge in its entirety leads us to conclude that the trial justice adequately instructed the jury.

■ With respect to defendant's first challenge to the trial justice's instructions, we conclude after reviewing the entire jury charge that the trial justice did not place the burden on defendant to prove diminished capacity. Throughout her initial and supplemental instructions the trial justice repeatedly emphasized the state's obligation to prove its case beyond a reasonable doubt. The trial justice stated that the state had to prove that defendant had the intent to kill Maria beyond a reasonable doubt. The trial justice instructed the jurors that in considering the defense of diminished capacity, if they are "not convinced beyond a reasonable doubt that he had a specific intent to kill because he was intoxicated at the time, and he was so intoxicated that his will was completely paralyzed, [then the] jury must * * * find him not guilty of murder." In her supplemental instructions the trial justice stated:

"The State needs to convince you, before you can return a verdict of either murder in the first degree or murder in the second degree, that the defendant did not have that kind of diminished capacity, that he was not so drunk at the time he struck his wife as to paralyze his will, and that those actions of his amounted to murder, either in the first degree or second degree, depending upon how long the intent to kill existed."

Clearly the trial justice did not erroneously place the burden on defendant to prove diminished capacity.

■ The defendant asserts that the trial justice's instruction on diminished capacity should have included extreme emotional disturbance, pathological jealousy, chronic alcoholism, and cultural differences as bases for the defense of diminished capacity. This court has said that when there is evidence to support a defense raised by a defendant, the trial justice should present the issue to the jury. *State v. Fetzik*, 577 A.2d 990, 993 (R.I.1990). However, "in the absence of any evidence," the trial justice

may decline "to give such an instruction." *State v. D'Amario*, 568 A.2d 1383, 1386 (R.I.1990).

■ We are of the opinion that the trial justice properly excluded Dr. Shammas's testimony concerning defendant's mental condition and possible cultural differences. The trial justice indicated that there was no factual predicate supporting defendant's requested charge. The doctor's testimony would not have aided the jury since the doctor could not testify concerning defendant's mental state or chronic alcoholism on the day of the murder. The defendant provided ample testimony regarding his intoxication and jealousy on the date of the murder and therefore was not precluded from asserting a defense of diminished capacity. Consequently defendant was not entitled to an instruction including extreme emotional disturbance, pathological jealousy, chronic alcoholism, and cultural differences as the bases for diminished capacity. As a matter of law cultural differences could not be a basis for reducing culpability.

■ With respect to defendant's third challenge concerning the trial justice's instruction on the lesser included offense of manslaughter, defendant points to the following portion of the trial justice's instruction:

> "If you're not convinced beyond a reasonable doubt that this was murder in the first degree, you will then decide whether or not beyond a reasonable doubt the defendant was guilty of the crime of murder in the second degree. If you're not convinced beyond a reasonable doubt, the defendant was guilty of murder in the second degree, and you would then decide whether or not the defendant has been proved guilty of manslaughter beyond a reasonable doubt."

The defendant claims that this instruction, together with the jury-verdict summary sheet, eliminated his presumption of innocence.

The trial justice's instructions emphasized the defendant's presumption of innocence. The trial justice stated that "the threshold of all cases [is that the defendant] is to be presumed innocent" and that this presumption "can only disappear if the State has convinced you beyond a reasonable doubt that he is guilty." When we read the instruction in the context of the entire charge, we find that the trial justice did not erroneously eliminate the defendant's presumption of innocence.

For the reasons stated herein, the defendant's appeal is denied and dismissed. We affirm the judgment of conviction of the Superior Court.