STATE

v.

**Peter VERLAQUE.**

**No. 82–159–C.A.**

Supreme Court of Rhode Island.

Sept. 6, 1983.

Dennis J. Roberts II, Atty. Gen., Margaret R. Levy, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Chief Appellate Atty., Provi-

dence, Janice M. Weisfeld, Asst. Public Defender, for defendant.

## OPINION

SHEA, Justice.

The defendant, Peter Verlaque (Verlaque), appeals from a Superior Court jury conviction of murder in the second degree. We reverse. Although Verlaque raises a number of issues, we shall address only those questions relating to the motion to suppress his confession and Rule 16 of the Superior Court Rules of Criminal Procedure.

On Friday evening, May 30, 1980, Verlaque left the Causeway Lounge in Smithfield, where he had been drinking for approximately four to five hours, and began hitchhiking to another bar. He decided to visit Maria Dube (Maria) after having been dropped off in the vicinity of her house. Sometime after she admitted Verlaque into her house, an argument erupted. The dispute continued in Maria's bedroom, where Verlaque started punching her, wrapped a towel around her neck, and finally strangled her. He then took a broken wine bottle and savagely cut her body in a number of places. Verlaque left Maria's dog in the bedroom with her body and departed. Having taken Maria's car keys, he drove away in her green Pontiac Firebird.

Verlaque spent the following day with a friend, Charles Pelletier (Charles). When Verlaque arrived in Maria's car, Charles inquired where he had gotten the car. Verlaque responded, "[Y]ou don't want to know" and added that "the girl that owned it didn't need it anymore." After relating that he had gotten into an argument with and beaten the girl, he said, "[Y]ou should have seen her, she was a real mess."

Later they gathered with some friends in a field on the outskirts of Pascoag. There, Charles's brother, Richard, told Verlaque that he should bring the car back to the rightful owner. Verlaque replied that he couldn't. Richard asked, "What the hell did you do? Did you kill her?" Verlaque only

said that she was dead. The following day, Verlaque left the car in a parking lot and threw the keys into a river.

Six days after the incidents described, at the urgent request of Maria's physician, a patrolman for the Smithfield police department went to Maria's residence to urge her to report for her kidney dialysis treatment. The patrolman entered the house through an open window and found Maria's now-blackened body and the remains of a dog. An autopsy revealed abrasions of the face and neck, hemorrhaging of the neck, multiple rib fractures, and lacerations of the chest, all of which resulted in death.

The following day, Verlaque asked Richard if he knew whether the police were looking for him. Richard asked Verlaque if he had strangled Maria or cut her. Verlaque answered that he wasn't sure which killed her. When Richard asked Verlaque if he had killed the dog, he answered, "No, Richard, you know I wouldn't do something like that."

On information obtained during their investigation, the police obtained an arrest warrant. Verlaque was arrested and transported to the Smithfield police station where he signed a waiver-of-rights form and confessed to the killing.

## THE MOTION TO SUPPRESS

The first issue we shall address is the trial justice's refusal to suppress Verlaque's confession. Verlaque claims that the state failed to prove that the waiver of his *Miranda* rights and subsequent confession were knowing, voluntary, and the product of a free and rational intellect unhampered by the effects of mind-altering drugs.

When a defendant challenges the voluntariness of a statement or confession, the trial justice must conduct a hearing outside the presence of the jury. The confession is admissible if examination of the totality of the circumstances surrounding the interrogation shows, by clear and convincing evidence, that the defendant voluntarily waived his right to remain silent and

have the assistance of counsel. *State v. Benton*, R.I., 413 A.2d 104, 109 (1980); *State v. Espinosa*, 109 R.I. 221, 228, 283 A.2d 465, 468 (1971). If the trial justice admits the confession, he must instruct the jury to make an independent assessment of its voluntariness. *State v. Killay*, R.I., 430 A.2d 418, 421 (1981). When reviewing the admissibility of a confession, this court initially looks at the record to determine if the trial justice adequately and correctly followed the procedural safeguards set forth above. If they were observed, we then proceed to examine the record in the light most favorable to the prevailing party and order reversal only if we conclude that the decision of the trial justice was clearly wrong. *Killay, supra* at 421. In the present case, we conclude that the trial justice correctly followed the procedural safeguards; therefore, we shall independently examine the record only to determine if his decision was clearly wrong.

In ruling on Verlaque's motion to suppress, the trial justice found that the state had met its obligation to prove, by clear and convincing evidence: (1) that Verlaque had been informed of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (2) that he had understood these rights and had knowingly, intelligently, and voluntarily waived them; and (3) that he thereafter made a voluntary statement. From our examination of the record, we find no reason to say that the trial justice was clearly wrong in concluding that Verlaque's confession was voluntary. The evidence presented indicates that Verlaque was adequately and effectively apprised of all his rights under the *Miranda* decision. In addition, the record is replete with evidence that Verlaque was able to understand those rights, the nature of his actions, and the consequences of a waiver. Although he was arrested at a beer party, the police officers testified that there was nothing

unusual about his speech, attitude, or actions; nor did the officers detect the odor of alcohol on his breath. Verlaque indicated that he did not want an attorney and that he did not wish to telephone anyone. In fact, when a family member called, Verlaque refused to talk with him.

We listened, as did the trial justice and jury, to the tape recording of Verlaque's statement. The statement itself is indicative of its voluntariness. It is replete with detail. No subject, however unpleasant, is avoided in Verlaque's narration of the events. His pronunciation is clear, not slurred. The assertion of defendant's appellate counsel that "Verlaque alternated between bouts of crying and strange fits of laughter" during his statement not only is an overstatement but is also very misleading. Verlaque laughed when he related to the officers that a certain woman decided to leave a party with him rather than with another man. Likewise, he cried when he related the gruesome details of the murder. After reviewing the entire statement, we are convinced that the crying is not conclusive of Verlaque's confusion or intoxication, rather it indicates remorse, embarrassment, and possibly revulsion at the viciousness of the murder. Moreover, Verlaque exhibited enough concentration to make corrections on the transcribed statement the same night that he confessed.

The defendant's appellate counsel places great reliance on Verlaque's testimony concerning the amount of alcohol he drank and the number of pills he ingested prior to his arrest. She makes much of Verlaque's statement that "these goofers are terrible." Although we are aware that the term "goofers" is slang for some type of drug, we believe, as did the trial justice, that this statement does not have much significance, largely because everything else about Verlaque's behavior and judgment appeared normal under the circumstances.[1] Furthermore, she overlooks the contradictory testi-

---

1. We also note that it is not clear from Verlaque's statement whether it was meant to describe his then-existing physical condition or was rather a reference to his physical or mental state at a prior time.

mony of the police officers and other witnesses which the trial justice, at the suppression hearing, chose to believe. In addition, the trial justice took into account Dr. John DeFeo's testimony concerning the effect combining a hypothetical amount of alcohol and drugs would have on a person's ability to reason, but he concluded that the hypothetical result was not consistent with Verlaque's condition when he gave his statement.

Our independent review of the record leads us to the conclusion that Verlaque probably exaggerated the amount of alcohol and drugs he had taken. Indeed, the record is full of competent evidence that supports the trial justice's conclusion that the confession was admissible. Verlaque's appeal on this ground, therefore, is without merit.

Verlaque also contends that the trial justice erred by holding the suppression hearing during the trial rather than prior to trial. Although we realize this issue need not be decided to dispose of this appeal, we take the opportunity today to review this area of the law. He relies upon *State v. Maloney*, 111 R.I. 133, 300 A.2d 259 (1973), where this court stated, "[I]n all criminal trials conducted subsequent to the filing of this opinion, efforts to suppress evidence must be, by motions, made and heard prior to trial." *Id.* at 144, 300 A.2d at 265.

Verlaque's reliance on *Maloney* is misplaced. In *Maloney,* this court was responding to a situation where the defense attorney failed to file a motion to suppress prior to trial. We believe that the court was concerned about the possibility of a defense attorney subverting the state's right to appeal an adverse evidentiary ruling by waiting to object to the introduction of evidence until after the trial has begun. An examination of Rule 12(b)(4) of the Superior Court Rules of Criminal Procedure in conjunction with *Maloney* supports our conclusion that the rule in *Maloney* was designed to preserve the state's right to appeal. Rule 12(b)(4) provides that "[a] motion before trial raising defenses or objections shall be determined before trial *unless*

*the court orders that it be deferred* for determination at the trial of the general issue." (Emphasis added.) The reporter's notes to this rule state that "[it] is fashioned in large part upon its federal counterpart."

Rule 12(e) of the Federal Rules of Criminal Procedure concerns the discretion of a trial justice to defer ruling on pretrial motions. The rule provides that the motion "shall be determined before trial unless the court, for good cause, orders that it be deferred * * * *but no such determination shall be deferred if a party's right to appeal is adversely affected.*" (Emphasis added.) Federal courts do require motions to suppress evidence to be heard prior to trial in order to prevent frustration of the central purpose of 18 U.S.C.A. § 3731 (West 1969), which essentially provides the government a right to appeal certain evidentiary rulings. *United States v. Barletta,* 644 F.2d 50 (1st Cir.1981).

The case at bar illustrates the necessity of the state's knowing the outcome of the motion to suppress prior to the empaneling of the jury. The postponement of the suppression hearing placed the state's case in a precarious position. By its request to delay the suppression hearing, the state forfeited its right to appeal since jeopardy would have attached to Verlaque before a ruling was made. It is hard to perceive how a defendant could be prejudiced by this procedure, for it appears the defense had much to gain and the state everything to lose by a postponement of the hearing.

■ All this aside, however, we would be willing to grant a defendant relief if he could demonstrate that he was prejudiced by the trial justice's refusal to hear the motion to suppress before trial. Verlaque's brief, however, simply does not set out how he was prejudiced by the midtrial suppression hearing. He couches his argument in general objections rather than make specific allegations, stating that "[a]n admissible confession will clearly affect a defendant's method of voir dire and jury selection; whether to make an opening statement at

all and when; how to cross-examine the state's witnesses; and whether to even contemplate taking the stand in front of the jury." Because Verlaque does not indicate any specific instances of prejudice, his contention that the trial justice committed reversible error by holding the suppression hearing during trial is without merit.

## DISCOVERY

The next issue concerns Rule 16 of the Superior Court Rules of Criminal Procedure. Verlaque claims that the state, through its prosecutor, repeatedly failed to provide timely and sufficient discovery pursuant to Rule 16. We must agree.

On November 10, 1980, defense counsel filed a motion for discovery and inspection pursuant to Rule 16. The motion included a request for a written list of the names and addresses of all persons that the attorney for the state expected to call as witnesses at the trial. The motion also requested:

"As to those persons whom the state expects to call as witnesses at the trial, all relevant recorded testimony before a grand jury of such persons and all written or recorded verbatim statements, signed or unsigned, of such persons and, if no such testimony or statement. of a witness is in the possession of the state, a summary of the testimony such person is expected to give at the trial."

On December 12, 1980, defense counsel filed a motion to compel discovery because the state had not yet complied with the discovery motion. A justice of the Superior Court granted the motion, ordering the state to furnish the discovery material by January 6, 1981. On December 18, 1980, the state partially complied with the discovery motion. However, it did not provide a list of witnesses and their addresses as had been requested. Instead, the prosecutor instructed defense counsel to "see attached list of names in report." The material that was included in the discovery packet included police reports written by Detective Thomas Oates and Sergeant Brian Burke, statements of Richard and Charles Pelletier and others, and Verlaque's confession.

On April 10, 1981, defense counsel filed a motion to compel further discovery. The motion included requests for the following: (1) a letter written by Maria Dube to a person by the name of Jill, (2) photographs of Maria Dube, and (3) copies of the grand jury tapes, the tape of Verlaque's confession, and the tape of Mr. Pelletier's statement. On April 29, the state answered the motion. It provided a copy of the letter and a copy of each of the requested tapes but objected to furnishing the photographs.

On August 18, 1981, the day the court began hearing pretrial motions, defense counsel made a motion to compel the state to furnish discovery material previously requested. This motion included a request for a list of witnesses that the state intended to call at trial. The prosecutor argued that the state had already complied with this request by providing defendant with statements and police reports within which he could find the names and addresses of the witnesses. The trial justice disagreed with the state's contention and ordered that the prosecutor provide the list requested. He stated, "[A] list means a list and not what names you can extract from the reports. There certainly can be far more names in the report than the state could possibly call as witnesses."

The following day the state furnished defense counsel with a four-page list of fifty-three names and addresses of witnesses. The prosecutor asserted that all of the names were extracted from the discovery material that was previously provided to defense counsel. Defense counsel requested a continuance for several days, arguing that he needed time to check the list against the material he had already received in order to properly prepare for trial. He stated also that he did not recognize thirty-five of the fifty-three names. He also pointed out that the state should have provided him with a summary of the testimony these witnesses would give and requested that the state be precluded from presenting witnesses whose

testimony had not been summarized. The trial justice ruled that he would address the request to preclude witnesses from testifying if and when the state called a witness whose testimony had not been summarized. He also denied the continuance requested. He stated that it was clear from the reports what the witnesses would testify to. Thereafter, Verlaque unsuccessfully moved to pass the case, claiming he was unprepared to go forward because of the state's failure to comply with discovery.

Later in the proceedings, during the mid-trial suppression hearing, the defense called Billy Hopkins (Hopkins) as a witness. It was during Hopkins's testimony that defense counsel first learned that Hopkins had given a statement to the police. Although the state had included Hopkins on its list of fifty-three witnesses, the state had never provided a copy of his statement to defense counsel. Again, defense counsel moved to pass the case because of the state's failure to comply with discovery. Although the trial justice denied the motion to pass, he ordered the prosecutor to review his files over the weekend to ensure that the defense had all the other witnesses' statements.

On the following Monday morning, the prosecutor acknowledged that the state had not turned over reports prepared by Detective Gerald Prendergast of the State Police. The prosecutor, however, stated that he did not believe that this material was discoverable. The trial justice agreed with him but once again ordered the prosecutor to review his list of witnesses to determine whether or not the state was in possession of statements of anyone else whose name was included on the list of witnesses.

The prosecutor then provided the defense with nine additional witness statements and reports, including the statement by William Hopkins. Simultaneously, the prosecutor also volunteered the activity report of Detective Prendergast, presumably in lieu of summarizing his testimony. Because of the late delivery of discovery material, defense counsel again asked the trial justice to declare a mistrial. He denied the motion, ruling that Verlaque was not prejudiced by the late tender of the additional witness statements. The trial justice did, however, grant defense counsel's alternative motion for a continuance until the following day so that the discovery material could be reviewed.

Verlaque argues that the trial justice committed reversible error by refusing to grant a reasonable continuance when the state delivered its list of fifty-three witnesses and by either failing to pass the case or by refusing to prohibit certain witnesses from testifying.

The imposition of any sanction for noncompliance with discovery obligations is a matter within the sound discretion of the trial justice. His ruling should not be overturned absent a clear abuse of discretion. *State v. Concannon*, R.I., 457 A.2d 1350, 1353 (1983); *State v. Coelho*, R.I., 454 A.2d 241, 245 (1982); *State v. Darcy*, R.I., 442 A.2d 900, 902 (1982). In *Coelho*, we stated that a trial justice, and this court on appeal, should examine four factors when considering a proper sanction for non-disclosure of discovery material. Those factors are "(1) the reason for non-disclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors."

When the trial justice denied Verlaque's motion for a continuance of several days to examine the list of fifty-three witnesses, it is clear that he believed that the prosecutor did not deliberately fail to comply with Rule 16. At the time the trial justice made his determination, he could not perceive, as we can after a review of the entire record, how deliberate the noncompliance actually was. The prosecutor only called fifteen of the fifty-three witnesses he listed. It is difficult for us to believe that an experienced prosecutor would not know the day before trial who would testify for the state. We can only conclude that the prosecutor deliberately failed to follow both the letter and the spirit of Rule 16. Defense counsel,

at the last minute, had to determine who of the fifty-three witnesses listed would testify and prepare to cross-examine them. It is apparent to us that at this time, the prosecutor knew that he would be calling less then one-third of them.

■■■ The language of Rule 16 is very clear. The prosecutor must provide a defendant with specific information when requested. The prosecutor does not have the authority to interpret the rule and decide what constitutes substantial compliance or equivalent compliance. Rule 16(a)(6) requires the attorney for the state to provide a list of witnesses, not what the prosecutor thinks is the functional equivalent of a list. The prosecutor should have provided the list when it was originally requested. The list should have named the people he expected to call as witnesses. A list of witnesses means just that—the people who will testify at trial. It does not mean everyone the Attorney General's department or the police interview in investigating the state's case. Too much information can be as useless as no information at all. This is especially true when an avalanche of information is dumped on the defense on the eve of trial. Because we conclude that the prosecutor deliberately failed to comply with Rule 16, it is unnecessary to consider whether or not Verlaque suffered procedural prejudice as a result of the noncompliance. *See State v. Concannon,* R.I., 457 A.2d at 1353.

We remind every prosecutor of the words of Justice Sutherland in *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935):

> "The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with

earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

The defendant's appeal is sustained, the judgment of conviction is vacated, and the papers of the case are remanded to the Superior Court for a new trial.