**STATE**

v.

**Jonathan OSTER.**

No. 2004–324–C.A.

Supreme Court of Rhode Island.

May 22, 2007.

Lauren S. Zurier, Providence, for Plaintiff.

John A. MacFadyen, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case came before the Supreme Court on January 29, 2007, on the state's appeal from two Superior Court orders that excluded wiretap evidence and compelled the state to produce additional discovery. The state contends that: (1) the trial justice erroneously granted the defendant's motion to suppress certain wiretap evidence, and (2) the trial justice erred when she ordered the state to provide the defendant with a comprehensive discovery response that the state alleges exceeds the requirements of Rule 16 of the Superior Court Rules of Criminal Procedure. For the reasons stated in this opinion, we affirm the order of the Superior Court in part and hold that the wiretap evidence is inadmissible, but we vacate the order compelling the state to provide additional discovery.

### Facts and Travel

The defendant, Jonathan Oster (defendant or Oster), the former town administrator for the Town of Lincoln, was indicted by a grand jury on two counts of obtaining or attempting to obtain a bribe by a public official in violation of G.L.1956 § 11–7–3 [1] and two counts of conspiracy

1. General Laws 1956 § 11–7–3, entitled "Solicitation or acceptance of bribe by agent, employee, or public official" states in pertinent part:
 "(a) No person in public or private employ, or public official shall corruptly accept, or obtain or agree to accept, or attempt to obtain from any person, for himself or herself or any other person, any gift or valuable consideration as an inducement or reward for doing or forbearing to do, or for having done or forborne to do, any act in

to obtain a bribe by a public official in violation of G.L.1956 § 11–1–6 and § 11–7–3, based on conduct alleged to have occurred between January 2, 2001, the day he took office, and February 16, 2002, the date of his arrest. A codefendant, Robert Picerno (Picerno), was charged in the same indictment with four counts of bribery by a public official in violation of § 11–7–3 and three counts of conspiracy to obtain a bribe by a public official. Although the cases were severed for trial, the trial justice, by agreement of the parties, heard and decided several pretrial motions in a joint proceeding.

The indictment against Oster and Picerno resulted from an investigation by the Financial Crimes Unit (unit) of the Rhode Island State Police (State Police). As part of the probe, in late 2001 and early 2002, the Attorney General sought authorization to intercept Picerno's telephone conversations under G.L. 1956 chapter 5.1 of title 12,[2] entitled "Interception of Wire and Oral Communications" (Wiretap Act). The state alleged that there was probable cause to believe that Picerno and other unknown persons had committed or were about to commit the crimes of extortion, solicitation or acceptance of a bribe, and conspiracy to commit those crimes, and that there was probable cause to believe that communications supporting the charges could be obtained through the requested wiretap.

The Presiding Justice of the Superior Court (the Presiding Justice) issued an order authorizing the interception of telephone conversations that are "for the purpose of committing the [enumerated] offenses" including the transmission of communications to coconspirators concerning, *inter alia,* extortion, solicitation and the receipt of bribes, and "the planning, implementation and continued operation of extortionate schemes[.]" Thereafter, the Presiding Justice issued additional orders, based on supplementary applications by the state, as well as applications to extend the original wiretap authorization. Overall, the State Police intercepted 1,576 phone calls in connection with three separate wiretap orders designated as Sprint 113,[3] Sprint 114, and Verizon 115.

Picerno was arrested on February 15, 2002; he was taken to State Police headquarters where he was interrogated for more than two hours by unit detectives. He offered to cooperate and implicate Oster in exchange for a cooperation agreement. Picerno agreed to participate in a so-called sting operation aimed at Oster. A plan was developed in which Picerno was to call Oster and arrange a meeting. After the two spoke by telephone, Picerno spent the night in custody at State Police headquarters.

---

relation to the business of his or her principal, master, employer, or state, city, or town of which he or she is an official, or for showing or forbearing to show favor or disfavor to any person in relation to the business of his or her principal, master, employer, or state, city, or town of which he or she is an official."

**2.** General Laws 1956 § 12–5.1–2, entitled "Application for orders," states in pertinent part:
 "(a) The attorney general, or an assistant attorney general specially designated by the

attorney general, may apply ex parte to the presiding justice of the superior court of competent jurisdiction for an order authorizing the interception of any wire, electronic, or oral communications. Each application ex parte for an order must be in writing, subscribed and sworn to by the applicant."

**3.** Oster did not challenge the state's storage and sealing of the tapes that comprise the Sprint 113 wiretap; consequently, that wiretap evidence is not the subject of this opinion.

On the morning of February 16, 2002, Picerno met Oster at Oster's law office and delivered an envelope containing $10,000 in cash. Unit detectives maintained audio, video, and visual surveillance of this encounter. Oster was arrested and a grand jury subsequently returned a four-count indictment against him.

### Electronic Surveillance

Both Oster and Picerno filed several pretrial motions, including motions to suppress the electronic surveillance evidence obtained by the state. The defendants alleged that the state had violated the Wiretap Act by failing to establish probable cause and neglecting to demonstrate the necessity for the electronic surveillance.[4] Additionally, defendants alleged that the state failed to minimize the number of non-pertinent conversations that were intercepted[5] and that wiretap evidence was disclosed through the discovery process.[6] Finally, defendants sought exclusion of the evidence based on the failure of the state to properly seal and store the wiretap evidence.[7]

On March 10, 2004, the trial justice issued the first of two written decisions in this case. She denied the motions to suppress on all grounds, except the alleged sealing violation. The trial justice reserved decision on this issue and ordered an evidentiary hearing. That hearing commenced on April 26, 2004, during which the state called six witnesses, including an investigator and a detective from the unit, as well as four employees or former employees from the Department of the Attorney General (the department). Additionally, by stipulation of the parties, an affidavit of the Presiding Justice was received into evidence.

The testimony established the chain of custody of the wiretap tapes, the sealing of the tapes under the direction of the Presiding Justice, and the negligent manner in which the tapes were stored and maintained under the supervision of various members of the department. Clifford Coutcher (Coutcher), an investigator employed by the State Police, testified that the investigation was conducted from a

---

4. The necessity element is set forth in § 12–5.1–4, entitled "Issuance of orders" which states in pertinent part:

 "(a) * * * the presiding justice of the superior court * * * may enter an ex parte order, * * * authorizing the interception of wire, electronic, or oral communications if * * *

 "(1) There is probable cause for belief that an individual is committing, has committed, or is about to commit a particular designated offense;

 "* * * [and]

 "(4) *Normal investigative procedures have been tried and have failed* * * *." (Emphasis added.)

5. Section 12–5.1–5, entitled "Form and content of orders" states in pertinent part:

 "Every order and extension shall contain a provision that the authorization * * * shall be conducted in such a way as to minimize the interception of communications not oth-

erwise subject to interception under this chapter * * *."

6. Section 12–5.1–10 states in pertinent part:

 "(b) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, electronic, or oral communication * * * may use the contents to the extent that their use is appropriate to the proper performance of his or her official duties.

 "* * *

 "(d) No otherwise privileged wire, electronic, or oral communication intercepted * * * shall lose its privileged character."

7. *Section 12–5.1–8(a) states in pertinent part:*

 "The presence of the seal provided for by this section, or a satisfactory explanation for its absence, shall be a prerequisite for the use or disclosure of the contents of any wire, electronic, or oral communication * * *."

secure facility inside an old National Guard hanger. On February 16, 2002, he received orders to shut down the operation. Coutcher testified that he counted the tapes to ensure that the total number of tapes corresponded to the recording logs and placed the original tapes inside a "banker's box." [8] He transported the box to State Police headquarters and locked the tapes in a cabinet to which only he had access. The next day, Coutcher inventoried the tapes and verified that he was in possession of all the tapes from the Sprint 114 and Verizon 115 wiretaps.

On February 19, 2002, Det. Sgt. Brian Casilli transported the tapes to the Superior Court, where he met with the Presiding Justice, along with Peter Neronha (Neronha), an Assistant Attorney General, and Saray Desnoyers (Desnoyers), a paralegal in the Criminal Division of the department. Under the direction of the Presiding Justice, the tapes were sealed, the Presiding Justice and Neronha signed labels that were affixed to each individual tape, and the tapes were placed in a box that also was sealed with the remaining signed labels.[9]

The record discloses that after the box was sealed, Desnoyers was responsible for delivering the tapes to a bank safe-deposit box maintained by the department. Desnoyers admitted that she took possession of the box, but rather than storing it in a

bank vault, she left it under her desk, purportedly because the storage space at the bank was full. According to Desnoyers, this was a temporary measure, "until we were able to go to the bank vault to make room for [the box of tapes]." Although Desnoyers said that her superiors were aware of the situation and that she had notified Neronha of the problem, Neronha disputed that testimony. Nevertheless, the box of wiretap tapes remained on the floor, under Desnoyers's desk, for approximately a year.

In January 2003, a new Attorney General assumed office and there was a change of administration in the department.[10] During the transition period, another employee, Alyson Adalio (Adalio), administrative assistant to the chief of the Criminal Division, took over Desnoyers's workspace. During the week of January 7, 2003, Adalio notified Marianne DeSimone (DeSimone), the chief paralegal of the Criminal Division, about the box of tapes. Ultimately, Adalio and DeSimone moved the box of wiretap tapes to vault storage located in the department. DeSimone testified that at some point during the next month, as they were taking the box to the vault, she noticed that the seal on the box was broken. DeSimone admitted that she opened the box, and, on a sheet of paper, described its contents. The box was then

8. A duplicate set of tapes simultaneously was recorded and kept by the State Police for investigatory purposes. *See* § 12–5.1–8(a) (stating that "[d]uplicate recordings may be made for use or disclosure pursuant to the provisions of § 12–5.1–10(a) or (b) for investigations and bail hearings and any pre-trial hearings").

9. According to the Presiding Justice's affidavit, it was his understanding that after the tapes were sealed, according to his instructions, they would be placed in a commercial bank vault or safe-deposit box. Before the

trial justice, the state argued that there was no order directing that the box be sealed. The trial justice found that based on the historic storage practice on the part of the department, as well as the state's obligation under the Wiretap Act and the directives of the Presiding Justice, there was an implied order that the wiretap recordings be stored in a secure bank vault. The state has abandoned this issue and has confined its appeal to the question of Oster's standing.

10. Patrick Lynch became Attorney General of the State of Rhode Island in January, 2003.

stored in a locked area in the department, where it remained for several months.

On October 3, 2003, the state produced the box containing the Sprint 114 and Verizon 115 wiretap tapes in Superior Court and admitted that the seal on the box had been compromised, and later acknowledged that the box had been opened. The record discloses that the Presiding Justice confirmed "that the seal has been broken, and it appears to be, obviously, intentional."

Thereafter, Oster and Picerno moved to suppress the wiretap evidence from the Sprint 114 and Verizon 115 tapes, arguing, *inter alia,* that the sealing violation, coupled with the failure of the state to store the box in a safe-deposit box, violated § 12–5.1–8(a).[11]

As noted, the trial justice issued two decisions in this case; in the first decision, she declared that exclusion of the evidence was required because of a sealing violation and that this result was separate and apart from other provisions in the statute providing for suppression for aggrieved persons, as defined by the Wiretap Act.[12] The trial justice found that § 12–5.1–8 contains explicit language prohibiting the use or disclosure of the contents of "any wire, electronic or oral communication if the seal provided for in § 12–5.1–8(a) is not present or if the [s]tate fails to give a satisfactory explanation for its absence." Thus, the trial justice found that the Wiretap Act requires exclusion of the evidence, as an independent remedy, for sealing and storage violations.

On March 24, 2004, before the April 26, 2004 scheduled evidentiary hearing, Picerno entered a plea of *nolo contendere* to all seven counts of the indictment, and was sentenced to eight years at the Adult Correctional Institutions, three years to serve, and the balance suspended with probation. The evidentiary hearing proceeded without Picerno, and the trial justice issued a second written decision, in which she addressed the issue of Oster's standing to challenge the sealing violation and the vio-

---

**11.** Section 12–5.1–8(a) reads in pertinent part:

"(a) The contents of any wire, electronic, or oral communication intercepted by any means authorized by this chapter shall, if practicable, be recorded on tape or wire or other comparable device. The recording of the contents of any wire, electronic, or oral communication under this section shall be done in such a way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions of the order, the recordings shall be made available to the presiding justice of the superior court issuing the order and sealed under his or her directions. Custody of the recordings shall be wherever the presiding justice of the superior court orders. They shall not be destroyed except upon an order of the presiding justice of the superior court, and in any event, shall be kept for ten (10) years. * * * The presence of the seal provided for by this section, or a satisfactory explanation for its absence, shall be a pre-requisite for the use or disclosure of the contents of any wire, electronic, or oral communication or evidence derived from them at any bail hearing or pre-trial hearing."

**12.** Section 12–5.1–12(a), as to suppression of intercepted evidence, provides:

"(a) Any aggrieved person may move to suppress the contents of any intercepted wire, electronic, or oral communication or evidence derived from them on the grounds that:

"(1) The communication was unlawfully intercepted;

"(2) The order under which it was intercepted is insufficient on its face;

"(3) The interception was not made in conformity with the order;

"(4) Service was not made as provided in § 12–5.1–11; or

"(5) The seal provided in § 12–5.1–8(b) is not present and there is no satisfactory explanation for its absence."

lation itself. The trial justice rejected the state's argument that Oster lacked standing because he was not an aggrieved person, stating that:

> "Unlike most wiretap challenges, the sealing requirements are not based on the Fourth Amendment protection from unreasonable searches and seizures; rather, they are designed to preserve the integrity, confidentiality, completeness and confidentiality of the tapes. * * * Therefore, the [s]tate's argument—that defendant Oster 'should be prohibited from contesting the admissibility of [electronic interceptions to which he was not a participant] on Fourth Amendment grounds * * *'—is not applicable in this context."

The trial justice also found that Oster was a participant in some of the recorded interceptions that had been negligently stored by the state.

Although the state has confined its appeal to the issue of Oster's standing, we shall briefly recount the trial justice's findings as they relate to both the sealing violation and defendant's standing. The trial justice declared that the "primary purpose of the [s]ealing [p]rovision is to protect the authenticity of the evidence and ensure that it is free from tampering or editing" and that it "help[s to] ensure that the integrity of the evidence, in terms of its completeness and its chain of custody, [is] preserved." She also noted that the provision "does not specifically address the manner in which" the court is to direct the sealing of the wiretap tapes,

and she observed that the sealing provision "neither imposes nor limits the mechanics of the sealing process." The trial justice found that the state had violated the sealing provision and that it was incumbent upon the state to provide a "satisfactory explanation" for the broken seal as a prerequisite for the use of the wiretap recordings at trial. Because the state had proffered *"no reason whatsoever"* for the broken seal, the trial justice refused "to engage in the kind of rank speculation" about why and under what circumstances the seal was broken. The trial justice granted the motion to suppress and the state appealed, arguing before this Court that Oster was not an aggrieved person and lacked standing to challenge the admissibility of electronic surveillance evidence.

### The Discovery Orders

In addition to its appeal with respect to Oster's standing in this case, the state also contends that the trial justice abused her discretion when she entered pretrial discovery orders that exceeded the scope of Rule 16 of the Superior Court Rules of Criminal Procedure and Rule 404(b) of the Rhode Island Rules of Evidence.[13]

On October 20, 2003, the trial justice entertained several pretrial motions that defendants filed and subsequently entered an order granting (in part) defendants' motions for a bill of particulars and for the production of what Oster has characterized as *"Verlaque"*[14] material. Additionally,

---

13. Rule 404(b) of the Rhode Island Rules of Evidence states:

> *"Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, prepa-

ration, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

14. *See State v. Verlaque,* 465 A.2d 207, 214 (R.I.1983) (holding that prompt disclosure of discoverable evidence is paramount to permit defense counsel to adequately prepare a defense).

she granted the state's motion to compel defendants' response to its discovery requests, with which, the state argues, Oster has yet to comply. With respect to the so-called *"Verlaque"* motions, the trial justice held:

> "The [s]tate is ordered to refine its discovery responses to date, and to identify the evidence, witnesses, and aspects of prior testimony it intends to introduce at each of the defendant's trials. * * * As part of this supplemental response, the [s]tate shall clarify and identify any evidence it proposes to elicit pursuant to Rule 404(b)."

In April 2004, the state filed a supplementary response and reduced its witness list from sixty-six names to approximately twenty-five witnesses, but included a caveat that it "reserve[d] the right to call any additional witnesses listed in the [s]tate's previous Rule 16 discovery documents and/or to introduce any additional evidence referenced in those same documents."

As noted, after Picerno's conviction, the state pared down its witness list. Nonetheless, Oster moved to strike the state's answer and to compel even more comprehensive disclosure by the state. The defendant argued that the answer filed by the state "is no answer at all" and that the "descriptions of proposed testimony * * * are so general as to be useless." Additionally, Oster asserted that the state's caveat reserving the right to call witnesses listed in the previous Rule 16 discovery documents "renders illusory the apparent narrowing of the [s]tate's witness list" and in effect meant that the state had "reject[ed the c]ourt's October 22, 2003 order outright."

Oster's motion prompted yet another hearing before the trial justice and a second discovery order, in which she directed the state to "provide[ ] additional discovery responses 'under the dictates of Rule 16'

and for *trial management purposes."* (Emphasis added.) The second order provided as follows:

> "1. The [s]tate is ordered to clearly indicate and identify those witnesses who the [s]tate intends to call as witnesses at the trial. The [s]tate is further ordered to detail whether the anticipated testimony is based on a prior statement and/or prior testimony and, if so, the portion(s) * * * the [s]tate intends to use; and insofar as there are no prior statements and/or prior testimony of witnesses or the witnesses' expected testimony goes beyond the identified statements/prior testimony in material part, the state shall summarize the witnesses expected testimony.
>
> "2. The [s]tate is ordered to specify the statements of the defendant that it intends to introduce at trial. The defendant's statements should be summarized and clearly itemized.
>
> "3. The [s]tate is ordered to specify the documents and specific tape-recorded telephone calls that the [s]tate intends to introduce at trial.
>
> "4. The [s]tate is ordered to identify any Rule 404(b) material the [s]tate intends to introduce at trial.
>
> "5. The [s]tate is ordered to deliver a transcript of Robert Picerno's testimony from the suppression hearing and plea."

It is from this order that the state appeals and argues that the trial justice abused her discretion when she directed the prosecutor to assume responsibilities that neither Rule 16 nor Rule 404(b) require; the state further argues that the order amounted to an amendment to the rules of discovery and the rules of evidence. The state contends that the order requires "it to notify a defendant, far in advance of trial, and without any reciprocal obligation on defendant's part, of all evi-

dentiary theories on which the [s]tate could conceivably rely." Finally, the state argues that the trial justice lacks the broad "trial management" authority that she cites to in her order. We agree with these contentions and vacate the order in part, in accordance with this decision.

## Standard of Review

 Questions of statutory interpretation are reviewed *de novo* by this Court. *Webster v. Perrotta,* 774 A.2d 68, 75 (R.I. 2001) (citing *Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates,* 763 A.2d 1005, 1007 (R.I.2001)). "In matters of statutory interpretation our ultimate goal is to give effect to the purpose of the act as intended by the Legislature." *Id.* (citing *Matter of Falstaff Brewing Corp. Re: Narragansett Brewery Fire,* 637 A.2d 1047, 1050 (R.I.1994)). "[W]hen the language of [the] statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Accent Store Design, Inc. v. Marathon House, Inc.,* 674 A.2d 1223, 1226 (R.I.1996). Furthermore, this Court has held that we "will not construe a statute to reach an absurd result." *Kaya v. Partington,* 681 A.2d 256, 261 (R.I.1996) (citing *Beaudoin v. Petit,* 122 R.I. 469, 476, 409 A.2d 536, 540 (1979)).

 When called upon to engage in statutory construction, this Court will examine statutes in their entirety, and will "glean the intent and purpose of the Legislature 'from a consideration of the entire statute, keeping in mind [the] nature, object, language and arrangement' of the provisions to be construed[.]" *In re Advi-*

*sory to the Governor (Judicial Nominating Commission),* 668 A.2d 1246, 1248 (R.I.1996) (quoting *Algiere v. Fox,* 122 R.I. 55, 58, 404 A.2d 72, 74 (1979)).

 Additionally, although a trial justice is vested with discretion in managing a trial and promulgating discovery orders in accordance with Rule 16, "the trial justice's discretion under the rule is limited, bounded by law, and reviewable." *State v. Coelho,* 454 A.2d 241, 245 (R.I.1982).

## Standing

 The state's appeal rests on its contention that Oster has no standing to seek the exclusion of the wiretap evidence based on the sealing violation. The state argues that, because the interception order was not directed to Oster's telephone, and because he did not participate in most of the intercepted conversations, he is not an aggrieved person and thus, does not have standing to challenge the use of the wiretap evidence. The state suggests that the sealing provision set forth in § 12–5.1–8(a) mirrors its federal analog, 18 U.S.C. § 2518(8)(a) (Federal Wiretap Statute),[15] and that this Court should look to federal law to decide this issue.

In *State v. Campbell,* 528 A.2d 321, 329 n. 11 (R.I.1987), this Court observed that the specific sealing provision under dispute in this case, § 12–5.1–8(a), "essentially duplicates the federal provision" found at 18 U.S.C. § 2518(8)(a). Although we have acknowledged that the "legislative goals of the two acts are clearly comparable[,]" *Campbell,* 528 A.2d at 328 n. 10, this Court also has declared that "[i]n the interest of giving the full measure of protection to an individual's privacy, particularly as it re-

---

**15.** 18 U.S.C. § 2518(8)(a) states in pertinent part: "The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, *shall be a prerequisite* for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517." (Emphasis added.)

lates to electronic eavesdropping, we shall insist upon a closer adherence to the Rhode Island statute than may be expected by those who interpret the federal legislation." *State v. Maloof,* 114 R.I. 380, 390, 333 A.2d 676, 681 (1975).

In its brief to this Court, the state provides a lengthy discussion of federal cases [16] and contends that federal courts have suppressed wiretap evidence based on sealing violations under 18 U.S.C. § 2518(8)(a) for aggrieved persons, as defined in 18 U.S.C. § 2510(11). An "aggrieved person" under 18 U.S.C. § 2510(11), is "a person who was a party to *any* intercepted wire, oral, or electronic communication or a person against whom the interception was directed[.]" (Emphasis added.) The state suggests that Oster is not such an aggrieved person and does not have standing to object to the use of this evidence and, therefore, suppression is not a remedy available to him. This assertion is incorrect.

The language of § 12–5.1–8(a) is clear on its face: "The presence of the seal provided for by this section, or a satisfactory explanation for its absence, *shall be a prerequisite* for the use or disclosure of the contents of any wire, electronic, or oral communication or evidence derived from them at any bail hearing or pre-trial hearing." (Emphasis added.) In contrast, § 12–5.1–12 restricts relief for violations of the Wiretap Act to aggrieved persons, and sets forth five grounds for suppression that are separate and apart from the sealing provision established in § 12–5.1–8(a).[17] Because we hold that Oster need not qualify as an "aggrieved person" to challenge a sealing violation, we are not required to decide whether Oster is an "aggrieved person" pursuant to § 12–5.1–12(a),—an issue which presents a closer question.[18]

We agree with the trial justice that exclusion of wiretap evidence for a sealing violation, as provided in § 12–5.1–8(a), is an independent remedy that is supplemen-

**16.** None of the federal decisions cited by the state is directly on point. *See, e.g., United States v. Angiulo,* 847 F.2d 956, 976, 978 (1st Cir.1988) (in which "the government moved for and was granted the right to unseal the bulk of the original tape recordings * * * for audio enhancement purposes" and, unlike the case at bar, "[t]he chain of custody was clearly established, * * * and agents * * * who were in charge of the custody and enhancement process, testified unequivocally that there were no unauthorized persons with access to the tapes, no tampering, no deletions"); *United States v. Burford,* 755 F.Supp. 607, 612 (S.D.N.Y.1991) (a case in which the court analyzed a delay in sealing, not a breached seal, and found that "[s]ince the government sealed the tapes on the first business day after the surveillance was terminated, there is no legitimate basis for excluding the tapes from evidence"); *United States v. Gambale,* 610 F.Supp. 1515, 1521–22, 1526 (D.Mass.1985) (discussing standing to move to suppress wiretap evidence in case in which "the tapes were unsealed only pursuant to a court order and in the presence of an authorizing judge"). In none of these cases was the evidence dumped under a desk to languish for months.

**17.** The state argues that a compiler's inadvertent and unauthorized amendment to the language of § 12–5.1–12(a)(5), which ostensibly altered the definition of an "aggrieved person" under that section, "worked a major substantive change in the suppression section of the wiretap statute." Because we hold that the independent remedy of suppression found in § 12–5.1–8(a) is the controlling statute, we need not address this argument.

**18.** Although we do not reach the issue of whether Oster was an "aggrieved person" under § 12–5.1–12(a), we note that it is clear from the application for the wiretap order and the affidavit in support of the application that Oster was named as a potential target of the electronic interceptions. Furthermore, it is undisputed that some conversations with Oster were intercepted.

tary to the remedy afforded to aggrieved persons as set forth in § 12–5.1–12(a). To read these sections otherwise would violate principles of statutory construction that seek to harmonize statutory provisions and would render some statutory language mere surplusage. Federal courts that have interpreted the analogous provision of the Federal Wiretap Statute have found that the provision declaring compliance with the sealing provision "shall be a prerequisite" is unambiguous and clear. "It leaves no room to waffle. * * * Congress, in the most unambiguous of terms, has built a custom-tailored suppression remedy directly into the very law which it crafted to shape and to govern post-interception usages." *United States v. Mora,* 821 F.2d 860, 866 (1st Cir.1987); *see also United States v. Diana,* 605 F.2d 1307, 1312 (4th Cir.1979) (stating that 18 U.S.C. § 2518(8)(a) "has its own independent exclusionary provision * * * so the exclusionary provisions of * * * [§ ]2518(10)(a) need not necessarily control."). Accordingly, we are satisfied that compliance with § 12–5.1–8(a) is an independent condition precedent to the use of wiretap evidence. The presence of a seal or a "satisfactory explanation" for its absence must be satisfied before this evidence may be used.[19]

Because the state has not challenged the trial justice's finding that there was a sealing violation, we are compelled to comment upon the gravity of the state's laxity and negligence in the mishandling and storage of this evidence. The state's failure to

appropriately store and protect the integrity of this evidence is shocking. These failings not only compromised the strength of the state's case, but also infringed upon the statutory protections afforded to the accused. "The rights of the targets of the investigation are deserving of consideration and cannot be overlooked." *Mora,* 821 F.2d at 869. That is why "any doubts about the integrity of the evidence should be laid at law enforcement's doorstep. It would be illogical (and unfair) to ask an accused to prove affirmatively that tampering has occurred." *Id.* at 868.

The trial justice declined to speculate "as to how and why the seal on the [b]ox was broken[.]" She was correct to decline to do so. Unfortunately, for long periods of time this evidence was mishandled and left under a paralegal's desk; the seal was broken and the box was opened. The state has proffered no explanation for this violation. Thus, the condition precedent to the admissibility of this evidence, the presence of the seal or a satisfactory explanation for its absence, has not been met. For all of the foregoing reasons, we affirm the trial justice's decision that the Sprint 114 and Verizon 115 tapes are inadmissible.

### Rule 16　Discovery Order

The state also appeals from the discovery order issued on July 15, 2004, and argues that:

> It is well established that this Court "[i]n reviewing a trial justice's decision on a motion to suppress, [will give] deference to the findings of the trial justice and shall not overturn his [or her] findings unless they are clearly erroneous." *In re John N.,* 463 A.2d 174, 176 (R.I.1983). As such, we see no reason to disturb the trial justice's finding in this instance.

---

**19.** In her decision, the trial justice found that: "[T]he Presiding Justice and the [s]tate affix[ed] seals to the individual tapes and the [b]ox in which those tapes were placed, the 'recordings' that comprise the Sprint 114 and Verizon 115 wiretaps were 'made available to the [Presiding Justice]' and 'sealed under his directions' within the meaning of the [s]ealing [p]rovision. The breaking of the seal on the [b]ox thus violates the [s]ealing [p]rovision * * *."

"the sweeping pretrial discovery order entered by the Superior Court in the instant case requires the [s]tate to assume responsibilities—such as summarizing and indexing for defendant Oster all of his previous statements, and identifying all of the [s]tate's proposed 404(b) evidence in advance (potentially upon pain of exclusion of the evidence * * *)—that neither Super. R.Crim. P. 16 nor R.I. R. Evid. 404(b) requires." The state contends that the trial justice abused her discretion in invoking "trial management" authority when she issued this discovery order. Specifically, the state assigns error to that portion of the trial justice's order that requires the prosecution, in addition to furnishing a definitive (and apparently final) list of witnesses expected to testify, "to detail whether [the witness's] anticipated testimony is based on a prior statement and/or prior testimony and, if so, the portion(s) of the statements or testimony the [s]tate intends to use." Additionally, the state contends that the trial justice erred when she ordered the state to specify the statements of defendant it intends to introduce at trial and to summarize and clearly itemize the statements made by defendant. The state also appeals from that portion of the order requiring the prosecution "to identify any Rule 404(b) material the [s]tate intends to introduce at trial."

The state argues that compliance with the challenged order would unfairly compromise its case-in-chief and encroach upon the state's trial strategy and work product by "burden[ing] the prosecution with responsibilities that are properly assigned to defendant's own counsel."

This Court has addressed the parameters of the discovery requirements of Rule 16 on prior occasions. We have noted that "Rhode Island has adopted one of the most liberal discovery mechanisms in the United States." *State v. McParlin,* 422 A.2d 742, 745 (R.I.1980). The rule is designed to permit an accused "to obtain detailed information in respect to the underlying circumstances to be presented in support of the accusation." *Id.* It is designed to prevent what has been referred to as "trial by ambush." *State v. Small,* 735 A.2d 216, 218 (R.I.1999) (mem.). Rule 16 and its mandate for extensive disclosure of evidence for use at trial, "was designed to be broad in scope so that neither the defense nor the prosecution is surprised at trial." *State v. Powers,* 526 A.2d 489, 491 (R.I. 1987). That is not to say, however, that the state's disclosure obligations may be employed as a procedural device for the later exclusion of material evidence. A criminal trial is a search for the truth; it is not a game of chess. *See State v. Diaz,* 456 A.2d 256, 258 (R.I.1983) (observing that the trial of a criminal case is a "search for the truth").

Although a trial justice is indeed vested with broad discretion over many facets of a trial, including the manner and order of proof, that authority is not unlimited. The discretion under Rule 16, as previously noted, "is limited, bounded by law, and reviewable." *Coelho,* 454 A.2d at 245. After a careful review of the record in this case, we are satisfied that the trial justice exceeded the bounds of her discretion and clearly erred.

Oster argues to this Court that the state's appeal of the discovery order of July 15, 2004 is not properly before us because it was not timely appealed. He asserts that because the state allegedly failed to respond to the court's first discovery order of October 22, 2003, he was forced to seek compliance, thus prompting the trial justice to issue a second order on July 15, 2004, from which the state now appeals. Oster asserts that the state's noncompliance was purposeful and intend-

ed to restart the appeals limitation period for the state. This argument is without merit.

The record establishes that the state filed a six-page response in accordance with the court's first discovery order issued in October 2003. Four months later, defendant moved to strike the response notwithstanding the fact that, in view of the Picerno plea, the state had reduced its list of witnesses who were expected to testify. It was only after defendant moved to strike the first answer that the state, faced with an even more onerous discovery order, and the underlying suggestion that the list would be considered final, sought review in this Court. Having moved to strike the state's answer and then advocating for a more expansive discovery response, including categorizing defendant's statements and providing so-called Rule 404(b) "material," defendant may not now suggest that the court's first and second discovery orders are identical.

We shall address each of the contested portions of the order of July 15, 2004 *seriatim.*

### Witness Lists and Summaries of Anticipated Testimony

■ In her order of July 15, 2004, the trial justice directed as follows:

"1. The [s]tate is ordered to clearly indicate and identify those witnesses who the [s]tate intends to call as witnesses at the trial. The [s]tate is further ordered *to detail whether the anticipated testimony is based on a prior statement and/or prior testimony and, if so, the portion(s) * * * the state intends to use;* and insofar as there are no prior statements and/ *or prior testimony of witnesses or the witnesses' expected testimony goes beyond the identified statements/prior testimony in material part,* the [s]tate shall summarize the

witnesses expected testimony." (Emphases added.)

Without question, the state has a continuing duty to provide the defense with a list of the witnesses that it expects to present in its case-in-chief. However, the prosecution is not required to categorize, index or catalogue the testimony of its witnesses. Moreover, the state may not be directed to specify the document or tape recording upon which "the anticipated testimony is based" nor is it required to designate the portions of any statements or prior testimony the state intends to use at trial. This work is the responsibility of the defense.

Rule 16(a)(7) sets forth in clear and unambiguous language the state's responsibilities: it must provide defendant with "a written list of the names and addresses of all persons whom the attorney for the [s]tate expects to call as witnesses" in the prosecution's case. Concerning those witnesses, Rule 16(a)(8) requires the state to produce "all relevant recorded testimony before a grand jury of such persons and *all* written or recorded verbatim statements, signed or unsigned, of such persons * * *." (Emphasis added.) Only if there is no prior testimony or any written statement of a witness in the possession of the prosecution is the state required to provide "a summary of the testimony such person is expected to give at the trial[.]" *Id.* This Court has held that Rule 16 "do[es] not obligate the state to provide a defendant with a detailed narration of the testimony of its witnesses." *State v. Woodson,* 551 A.2d 1187, 1192 (R.I.1988). The rule "simply requires the state to provide a defendant with all the relevant. recorded data on which the testimony of its witnesses will be based." *Id.* A written summary of a witness's expected testimony is required only when the state does not possess prior testimony or written state-

ments of the witness. *Id., see also State v. Williams,* 752 A.2d 951, 953 (R.I.2000) (holding that "[t]here is no requirement pursuant to Rule 16(a)(7) that the state provide a detailed narration of the testimony of its witnesses"). We hasten to add, however, that for those witnesses for whom there is no written or recorded statement, a summary must be produced, and it must be meaningful.

The record establishes that the state has already provided two lists of potential witnesses with summaries of their expected testimony: the first, in November 2002, listed sixty-six potential witnesses; the second, prepared in April 2004, after the Picerno plea, reduced the list to twenty-five witnesses, with the caveat that the state "reserve[d] the right to call any additional witnesses listed in the [s]tate's previous Rule 16 discovery documents and/or to introduce any additional evidence referenced in those same documents." The state argues that it has no obligation to "provide Oster with the sort of written annotation" that the trial justice included in her order. We agree.

In this case, as in *Woodson* and *Williams,* the state has provided defendant with prior testimony and statements of the witnesses it expects to call, as well as witness lists and summaries of the expected testimony of those witnesses for whom no written statements exist. Oster argues that the "summaries of proposed testimony [are] so general as to be useless" and that the inclusion of the caveat in the reduced witness list in which the state reserved the right to "call additional witnesses" renders the narrowed list "illusory" and he cites to our holding in *Verlaque* to support his argument that a "list of witnesses means just that—the people who will testify at trial." *State v. Verlaque,* 465 A.2d 207, 214 (R.I.1983). However, the facts of this case differ vastly from the

facts of *Verlaque,* in which the state delivered a list of fifty-three names of potential witnesses on the very eve of trial. *Id.* at 212. The defendant's motion for a continuance to examine the list, which included thirty-five names that he did not recognize, was denied, and the prosecutor proceeded to call only fifteen of the fifty-three potential witnesses listed in his eleventh-hour response. *Id.* at 212, 213. This Court vacated the conviction and noted that it was "difficult for us to believe that an experienced prosecutor would not know *the day before trial* who would testify for the state." *Id.* at 213 (emphasis added). This case has no resemblance to *Verlaque.*

Here, the state has provided Oster with its potential witness list with ample time before trial to review the state's answer and to examine the list of witnesses. There is no evidence before us that the state is deliberately attempting to avoid its Rule 16 responsibilities. The state, however, is not required to do defendant's work. We agree with the state that once defendant, in accordance with Rule 16, has been provided access to all available information well in advance of trial, it is incumbent upon defendant "to review and master the discovery record." Nothing in Rule 16 requires the state to provide the kind of detailed specification about the testimony of expected witnesses that Oster demanded. Nor are we persuaded that the imposition of such an onerous burden on the state is necessitated by trial management considerations.

In this and every criminal case, the state bears a heavy burden of proof. Its concern, as evidenced in its reservation of the right to call witnesses listed in its discovery documents in the event that "unforeseen circumstances" at trial require it to do so, is entirely valid. The trial justice stated that the court was "sympathetic to the [s]tate's desire not to be so hamstrung

by its discovery response that it can't address unanticipated difficulties[.]" Having said that, however, she nonetheless refused to make a ruling about whether the state would be permitted to go beyond what was characterized as a *Verlaque* list of witnesses.

To the extent that the trial justice required the state to provide additional specification of its witnesses' testimony, she erred, and we vacate that portion of the order. At the same time, however, we note that "the state's disclosure obligation does not end upon the tendering of an initial discovery response"—the prosecution has a continuing obligation under Rule 16(h) [20] to provide defendant with additional discovery. *State v. LaChapelle*, 638 A.2d 525, 530 (R.I.1994). This continuing duty, coupled with the witness statements (and summaries of expected testimony of witnesses for whom there is no written statement) that the state already has provided, are sufficient to fulfill the state's duty as required by Rule 16(a)(7), (8), "by minimizing the undesirable effect of surprise at trial, and by otherwise contributing to an accurate determination of the issue of guilt or innocence." *Coelho*, 454 A.2d at 244 (quoting Fed.R.Crim.P. 16 advisory comm. note).

### Summaries of Defendant's Prior Statements

■ With respect to any statements of defendant, the trial justice ordered:

"2. The [s]tate is ordered to *specify* the statements of the defendant that it intends to introduce at trial. *The defen-*

*dant's statements should be summarized and clearly itemized.*" (Emphases added.)

Before this Court, the state argues that by its clear language, Rule 16(a)(1) requires that it produce and make available to the defendant *all* relevant written or recorded statements of defendant and *all* confessions, signed or unsigned. If there is an oral statement or confession, the state must produce a written summary. The state contends that with the exception of oral statements, it has no obligation to "specify" or "clearly itemize" or "summarize" which of defendant's statements it intends to introduce at trial. We agree.

Rule 16(a) requires that the state "permit the defendant to inspect or listen to and copy or photograph * * * (1) *all* relevant written or recorded statements or confessions, signed or unsigned, or *written summaries of oral statements or confessions* made by the defendant, or copies thereof." (Emphases added.) This is the extent of the state's discovery obligation relative to statements or confessions of defendant. Accordingly, that portion of the order also is vacated.

### Specification of Trial Exhibits

■ In the order of July 15, 2004, the court required the state to "specify the documents and specific tape-recorded telephone calls that the [s]tate intends to introduce at trial." [21] The state argues that Rule 16(a) requires no such specification, but rather requires only that the state "permit the defendant to *inspect or listen*

---

**20.** Rule 16(h) of the Superior Court Rules of Criminal Procedure, entitled *"Continuing Duty to Disclose"* states:

"If, subsequent to compliance with a request for discovery or with an order issued pursuant to this rule, and prior to or during trial, a party discovers additional material previously requested which is subject to dis-

covery or inspection under this rule, he or she shall promptly notify the other party of the existence thereof."

**21.** Obviously, our decision in this opinion excluding any recorded interceptions from the Sprint 114 and Verizon 115 orders, has a bearing on this portion of the discovery order.

*to and copy * * * (4) all* books, papers, documents, photographs, sound recordings, or copies thereof * * * which are intended for use by the [s]tate as evidence at the trial or were obtained from or belong to the defendant[.]" (Emphases added.) In deciding this issue, we are mindful that we do not write on a clean slate.

In *State v. Mollicone*, 654 A.2d 311 (R.I. 1995), a highly complex case with a much more voluminous collection of documents than the case at bar, we rejected the argument that the state was obliged to prepare a list of the particular documents that it intended to introduce at trial:

> "In furnishing the material pursuant to this rule and offering defendant and his counsel the opportunity to inspect and copy documents long prior to trial, the state fulfilled its obligation. Unlike the situation in *State v. Coelho*, 454 A.2d 241 (R.I.1982), and *State v. Verlaque*, 465 A.2d 207 (R.I.1983), the state in this instance was not tardy or belated in providing this information and opportunity to defendant * * * well in advance of the trial[.]" *Mollicone*, 654 A.2d at 325.

In this case, as in *Mollicone*, the state has provided Oster with access to *all* documents and tape recordings well in advance of trial. In doing so, the state has complied with Rule 16(a)(4), and it need not supply defendant with an evidentiary road map of its case-in-chief. We are of the opinion that the portion of the order directing the state "to specify the documents and specific tape-recorded telephone calls" it intends to use at trial constitutes error.

We also pause to note that our holding in *Verlaque* did not alter or increase the state's discovery obligations. The error in *Verlaque*, 465 A.2d at 214, concerned the state's willful failure to timely comply with its Rule 16 responsibilities. In *Verlaque*, the trial justice, after allowing the state to supply defendant with a voluminous, eleventh-hour discovery response, denied defendant a brief continuance to examine the materials. *Id.* at 212–13. This Court held that "[t]oo much information can be as useless as no information at all." *Id.* at 214. We noted, however, that this was of particular significance "when an avalanche of information *is dumped on the defense on the eve of trial." Id.* (Emphasis added.) We concluded that the prosecutor's deliberate failure to comply with Rule 16 required reversal, without requiring a showing of prejudice. *Verlaque*, 465 A.2d at 214. Our holding in *Verlaque* does not require the state to go beyond the requirements of Rule 16. The state is not obliged to refine its responses or catalogue its evidence.

### Rule 404(b) Material

Finally, the trial justice's order of July 15, 2004, requires the state to identify any Rule 404(b) "material" it intends to use at trial. The state argues that nothing in the Rhode Island Rules of Evidence requires the state to provide defendant with advance notice of evidence that may be admissible under Rule 404(b). Further, the state contends that the trial justice's order effectively transforms Rule 404(b) into a discovery rule and that the order was issued far in excess of the trial court's authority. The defendant argues that the state's appeal on this issue is moot because the state filed a Rule 404(b) response in April of 2004. However, the order from which the state has appealed specifically directs the state "to identify any Rule 404(b) material the [s]tate intends to introduce at trial." Because the state has a continuing obligation to comply with this order, it has a continuing stake in the outcome of this controversy. We are satisfied that the state's appeal of the Rule 404(b) portion of the order is properly before the Court. *See Credit Union Cen-*

*tral Falls v. Groff,* 871 A.2d 364, 369 (R.I. 2005).

We begin our analysis by noting that Rule 404 is a rule of evidence that excludes the use of prior bad acts to prove propensity, with the limited exceptions set forth in Rule 404(b). Rule 404(b) is neither referred to nor cited in Rule 16 and simply is not part of the state's discovery obligations. We need look no further than defendant's brief, which concedes that "Rule 404(b) is not a discovery device." [22] Significantly, whether evidence falls within the parameters of Rule 404(b) may be debatable and is a question of law that ought not be delegated to the state. The proper vehicle for the trial justice to determine whether Rule 404(b) evidence exists and is admissible at trial is through the judicious use of motions *in limine* or by ruling upon objections made during the course of trial. Accordingly, we deem erroneous the portion of the order requiring the state to identify any Rule 404(b) material it intends to introduce at trial.

In sum, we conclude that to "require the state to do anything beyond its Rule 16 obligations would be repugnant to the adversarial underpinnings of our criminal justice system." *State v. Peabody,* 611 A.2d 826, 833 (R.I.1992).

### Conclusion

For the reasons stated in this opinion, the state's appeal is denied in part and granted in part. We deny and dismiss the state's appeal concerning defendant's standing to suppress the Sprint 114 and Verizon 115 wiretap tapes, and affirm the order granting Oster's motion to suppress those wiretap recordings. However, we grant the state's appeal concerning the discovery order of July 15, 2004. We vacate that order and remand this case to the trial court for further proceedings consistent with this opinion.

---

**22.** The defendant acknowledges "that the text of the Rule does not require pretrial identification" of evidence that may relate to other crimes or wrongs, or acts.